Filed 1/23/18 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| J. BRENT ARAVE,<br>    Plaintiff and Appellant,<br>    v.<br>MERRILL LYNCH, PIERCE, FENNER &<br>SMITH INC. et al.,<br><br>    Defendants and Appellants. | E061677<br><br>(Super.Ct.No. RIC1108279)<br><br>ORDER MODIFYING<br>OPINION AND GRANTING<br>PARTIAL PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

_____

We GRANT the request to publish part II.C. of the opinion filed on January 2, 2018 (the opinion). Part II.C. (pages 52-63) addresses the issue of trial court bias and meets the standard for publication in California Rules of Court, rule 8.1105(c). We ORDER the opinion be modified by removing "II.C.," from the footnote on page one, which excludes certain sections from publication, and thereby designate part II.C. for publication.

Except for this modification, the opinion remains unchanged. This modification does not affect the judgment.

CERTIFIED FOR PARTIAL PUBLICATION

SLOUGH_____

J.

We concur:


RAMIREZ_____

P. J.


McKINSTER_____

J.

Filed 1/2/18 (unmodified version)

CERTIFIED FOR PARTIAL PUBLICATION[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| J. BRENT ARAVE, | |
| Plaintiff and Appellant, | E061677 |
| v. | (Super.Ct.No. RIC1108279) |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., et al., | OPINION |
| Defendants and Appellants. | |

Appeal from the Superior Court of Riverside County. Gloria Trask, Judge.

Affirmed in part; reversed in part with directions.

Hollins Law, Kathleen Mary Kushi Carter, and Christine R. Arnold for Plaintiff

and Appellant.

Davis Wright Tremaine, Emilio G. Gonzalez, Rochelle L. Wilcox, and Jacob W.

Daniels for Defendants and Appellants.

---

[*] We certify this opinion for publication under California Rules of Court, rules 8.1105(b) and 8.1110, except for parts I.B., I.C., I.D., I.E., I.F., I.G., II.A.1., II.A.2., II.A.4., II.A.5., II.A.6., II.B., II.C., II.D., II.E., II.F., and II.I.

1

Plaintiff and appellant, J. Brent Arave, brought several claims under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) against his former employers, Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), Bank of America (BoA), his supervisor Joseph Holsinger, and a human resources supervisor, Katherine Anderson (collectively, defendants). He sought to recover damages caused by discrimination, harassment, and retaliation based on his membership in the Church of Jesus Christ of Latter-day Saints. He also sought damages for nonpayment of wages (Lab. Code, § 201) and whistleblower retaliation (Lab. Code, § 1102.5).

After a five-week trial, the jury returned a verdict in favor of defendants on all counts that had survived summary judgment and dismissal. The trial court denied Arave's posttrial motions and awarded defendants, as prevailing parties, $54,545.18 in costs, $29,097.50 in expert witness fees, and $97,500 in attorney fees incurred defending against Arave's wage claim.

Arave appeals the verdict and the award of fees and costs. He maintains:

(1)   The trial court made numerous evidentiary errors, which prejudiced Arave;

(2)   Defense counsel committed prejudicial misconduct;

(3)   The trial court's bias deprived him of a fair trial;

(4)   The trial court committed prejudicial error by instructing the jury certain evidence could not constitute harassment attributable to his employers;

(5)   The jury's verdict was not supported by substantial evidence because defendants conceded they subjected Arave to an adverse employment action;

(6)   The trial court erred in denying Arave's motion for a new trial;

2

(7) The trial court erred by awarding defendants $97,500 in attorney fees on Arave's wage claim despite not finding the claim frivolous;

(8) The trial court erred in awarding defendants costs and expert witness fees on Arave's FEHA claims despite finding the claims nonfrivolous; and

(9) The trial court erred in granting summary judgment in favor of individual defendant Katherine Anderson on Arave's harassment claim.

Defendants cross-appeal, contending the trial court abused its discretion when it determined Arave's FEHA claims were not frivolous and denied them attorney fees on those claims.

We affirm the trial court in all respects but two. We conclude the trial court erred by awarding $83,642.68 in costs and expert witness fees though it found Arave's FEHA claims were nonfrivolous, and therefore reverse the order making the award. However, because a portion of the award may be attributable to Arave's wage claim, we will remand for the trial court to make that apportionment, as appropriate. We also conclude the trial court erred by awarding $97,500 in attorney fees on the wage claim without determining whether that claim was frivolous. We will remand for the trial court to make that determination.

# I

## FACTUAL BACKGROUND

### A. *Overview*

The impetus of this employment discrimination case was an anonymous employee satisfaction survey conducted on behalf of BoA and Merrill Lynch in August and

September 2010.[1]  Arave, who is a member of the Church of Jesus Christ of Latter-day

Saints (Mormon Church or LDS), was then the managing director of Merrill Lynch's

Desert Inland Empire Complex, which comprised five offices, approximately 95 financial

advisors, and approximately 120 to 140 total employees.  The survey contained negative

comments about Arave's leadership, many of them focused on the accusation he showed

favoritism toward members of his church (Mormons).

The survey results became available in December 2010.  However, Arave did not

review the results until his new regional manager, Joseph Holsinger, emailed everyone in

the region about them in January 2011.  Holsinger was new to the job.  BoA had

promoted him from director of another complex to regional managing director of the

southwest market, and he began the new job on January 3, 2011.  He received the survey

results on January 7, 2011 and emailed all employees in his region about them on January

17, 2011.  Holsinger said he wanted to ensure his employees he had read all their

comments and let them know they could count on receiving meaningful responses from

management.

Arave replied by email to Holsinger to say he had not seen the survey, but wanted

to respond, and to express interest in being promoted to director of a larger complex in

Orange County.  In the ensuing days, Holsinger informed Arave he would not be

considered for the promotion, told him the survey comments were one reason why, and

---

[1]  BoA acquired Merrill Lynch before the events of this dispute.  According to human resources Vice President Wendy Wall, Merrill Lynch employees became BoA employees on January 1, 2010.

4

met with him to discuss responding to the religious favoritism comments.  Holsinger encouraged Arave to address everyone in his office and "take ownership" of the environment which led to the perceptions of favoritism expressed in the survey.  Initially, Arave seemed receptive to addressing the issue, but later said he did not want to address the religious favoritism comments, and said he did not appreciate being asked to apologize for his religion.  According to Arave, he regarded the comments themselves as harassing and had told both Holsinger and Katherine Anderson—a BoA human resources manager Holsinger had charged with helping Arave respond to the comments—that he viewed them as such.

On March 17, 2011, Arave's attorneys sent BoA a letter complaining of religious discrimination and retaliation.  According to the letter, the comments were acts of religious discrimination and Arave was their victim.  He accused BoA of failing to investigate the discriminatory comments, denying him a promotion based on the comments, requiring him to apologize for his religion, and otherwise creating a hostile work environment.  BoA began an investigation into Arave's accusations.  Though a third party hired to conduct the investigation sought to interview him, Arave found the person hostile and refused to be interviewed.

On March 29, 2011, Arave resigned and later filed suit against BoA, Merrill Lynch, Holsinger, and Anderson.  In addition to Arave, Holsinger, and Anderson, the primary witnesses were Gregory Franks, the divisional director of the Merrill Lynch western region and Holsinger's superior and two human resources management

5

personnel—Wendy Wall and Mary Mack.  Wall was a senior vice president in the human resources department who reported to Franks and supervised Anderson.  Mack was a vice president and team manager in the department which investigated discrimination complaints (Advice and Counsel), and she consulted with Anderson and Wall about the survey comments.  The facts as we recount them come from the testimony of those six witnesses and trial exhibits they discussed.[2]

**B.** *The Associate Satisfaction Survey*

BoA engaged a consulting firm to conduct a survey of its employees to gage their satisfaction.  The consultant conducted the survey from August 16 to September 17, 2010 and produced reports summarizing the survey results for BoA on December 12, 2010.  The survey asked respondents to rate as favorable, neutral, or unfavorable their reactions to such statements as:  "I feel proud to work for Bank of America," "My total compensation is tied to performance," and "My work gives me a sense of personal accomplishment."

The survey also asked respondents for suggestions to help improve employee satisfaction.  Many of the comments for the Desert Inland Empire Complex complained Arave gave preferential treatment to Mormons.  We reproduce those comments in full here, because they lie at the heart of the dispute.

"Why does this branch constantly show favoritism towards a certain religious affiliation of the [identifier deleted]?"

---

[2] Eleven other witnesses testified at trial.  We have reviewed their testimony, but do not recount it because it is not important to resolving the issues on appeal.

"Are we now Merrill LDS Lynch?"

"Can we hire people in [identifier deleted]—or do we have to keep going to get employees in [identifier deleted]?"

"Why doesn't the [identifier deleted] worry about his existing FA's [financial advisors] as opposed to reaching out solely to his religious LDS peers?"

"I'm tired of the [identifier deleted] only hiring guys that are Mormon like him and then preaching at our sales meetings."

"Management and supervisors need to STOP showing favoritism in workplace!"

"[P]erhaps we could treat people more fairly who are NOT part of a particular religious sect."

"[I] believe the manager wants to eliminate anyone who isn't of his religion or 'a good old "[identifier deleted]."'"

"It would be nice if our mgr hired new people from other than just [identifier deleted] or just his religion."

"[W]e have too much favoritism to certain groups and [identifier deleted]— I'm probably one of them but it's not [an] even playing field and believe we could lose good people."

"Stop hiring and favoring 1 religion in my branch."

"Stop hiring only guys from [identifier deleted] and bringing them to our [identifier deleted] branch."

"I'd like to know how many of one particular religious group we're going to continually hire in my branch i.e.—all are from [identifier deleted]—this is getting ridiculous—would our mgr feel comfortable if we only hired women, muslims etc??"

"There is too much favoritism to the [identifier deleted] religious factor in our branch."

The consultant who conducted the survey replaced certain words and phrases in the comments with "identifier deleted" to safeguard anonymity before providing the survey results to BoA. Context makes clear the comments address Arave's recruiting new hires from Utah and specifically Brigham Young University (BYU), his alma mater, and the perception he favored Mormon employees over non-Mormon employees in general. The comments on these topics make up a minority of the comments overall, but constitute a substantial subset and one of the comments' most obvious themes.

The regional market management team sent reports containing the survey results to management, including Arave, on December 20, 2010.

**C.** *Bank of America's Reaction to the Survey Comments*

Joseph Holsinger began working for Merrill Lynch in 1993. From 2002 to 2010, he was the managing director of the Greater Fort Lauderdale Complex. At the end of 2010, BoA promoted him to regional managing director of the southwest market, making him Arave's supervisor.

Arave sent Holsinger a welcome email on Monday, January 3, 2011, his first day on the job. "Congratulations!!! It is a small world. I am looking forward to working with you. [¶] I told [your predecessor] that I am interested in the Newport Complex. Let me know when you would like to have a discussion." The complex Arave referred to was a very large group of Merrill Lynch offices located in Orange County, which at the time did not have a managing director. It was Holsinger's responsibility to fill the

8

vacancy, and Arave wanted to be considered for the position. Arave said he was interested in the job because it was a bigger complex and he could earn more money.

The next day, Holsinger brought up the issue of filling the Orange County position with his supervisor, Greg Franks. He let Franks know Arave was interested in the position and raised the question whether the complex should be split up rather than be given to a single director. "Arave expressed desire to be on the interview list for orange county. As this is a huge complex, would also like some advice on my evaluative approach for candidates. Am fine doing this on my own, but this is a really big deal and would prefer to measure twice . . . . . cut once. Also asking questions 'should it remain one complex or 100% intact?'" According to Holsinger, he had neither ruled Arave out as a candidate nor decided whether to keep the complex intact at that time.

On Friday, January 7, Holsinger received the results of the employee satisfaction survey for the complexes in his region. He said he read the results for every office and complex, including the comments. Holsinger said he was concerned about the results for Arave's complex. He noted they showed problems throughout the complex, but said the problems were pronounced in Arave's office. Of the comments relating to religion, Holsinger said he understood them as reporting favoritism, and not as discriminating against Mormons. Holsinger said he shared the favoritism comments immediately with his boss, Greg Franks, and Katherine Anderson in human resources.

On Monday, January 17, Holsinger sent an email to everyone who worked in the region to discuss the survey. Holsinger said he was concerned a high percentage of

9

respondents doubted management would take any action on the basis of the survey and wanted to address that concern. "I have just completed two full reviews of the entire deck of survey results detailing your input across the Southwest Region . . . I want to reiterate that I read every single written comment complex by complex. You should also know that I reviewed our rankings by dimension at the regional level as well as at complex and associate office level. Relative to the firm's rankings, it is safe to say we have opportunity to improve. [¶] The single most striking revelation is the overwhelming opinion expressed by many of you indicating you held little faith that any actions would be taken as a result of this survey. [¶] You all have my personal and professional commitment that you will see meaningful and measurable response this year to the input generously provided by so many of you."

In the meanwhile, Arave had left for Utah to care for his father, who had suffered a heart attack and later passed away. By Monday, January 17, Arave had returned home and he responded quickly to Holsinger's email about the survey results. He thanked Holsinger for sending flowers in recognition of his father's passing and wrote, "I would like to get together with [you] this week and discuss Newport. I also have some input on the Southern California market I would love to share with you. I have been in SC my entire 25-year career at Merrill. I must have missed the survey. I would love to respond." At trial, Arave explained he did not think he had seen the email circulating the survey results, though it was addressed to him, so he had not reviewed them when

Holsinger sent his email. Holsinger wrote back to say he would be busy until the next afternoon, and he would call Arave then.

The next day, Holsinger called Arave to deliver the news he would not be considered for the Orange County job. At trial, Holsinger said, "After looking at his business results carefully, which we pay close attention to, after looking at his performance with organic hiring and development of our trainees in this market, and after looking at the troubling, both written and overall, comments in the survey, I definitely made the decision that I would not consider him for a market more than two times the size of the one he was running." Asked by Arave's counsel whether he told Arave he would not consider him for the position because of the survey results, Holsinger said he told Arave he had made his decision based on the comments, which he found alarming, *as well as* the fact that Arave was "performing in the bottom 40 percent of directors for the year 2010 in business results and performing in the bottom 85 percent in his PMD[3] results going back to 2008." Arave's account of the conversation was similar. He said, Holsinger "basically told me . . . 'there's some bad stuff about you on the survey, and your numbers are not where I'd like them to be, I'm not going to consider you for the position.'" Arave said Holsinger did not mention religion on the January 18 call and did not make any demands of Arave. In addition, Arave acknowledged he was in the bottom 40 percent of firm-wide directors for 2010 and that his PMD score was the sixth worst out of 49 markets.

---

[3] PMD stands for Practice Management Development, Merrill Lynch's management training program.

11

Following the phone call, Arave spent the next four or five hours reviewing the results of the survey for the first time. Arave said he interpreted the qualitative results as showing there were issues related to executing the merger of BoA and Merrill Lynch that required improvement in his complex. Arave said he reacted to the comments about religious favoritism with shock. "[M]y first impression was, you know, why is someone so upset about our religion?" He said based on how the comments were grouped together, he thought they came from one person. He said, "I felt [the comments] were abusive. I thought they were certainly harassing towards anyone that would be LDS. And the reason that I got to that conclusion as I was reading them, I thought to myself, why would somebody begin to identify hiring too many Mormons from BYU? Because, first of all, the facts didn't substantiate that, so I knew that the facts weren't there. We hadn't hired that many people. And secondly, the reason we hired anybody wasn't because of their religion" but because they "had the qualifications that we could use to be successful in our complex."

Arave said he concluded the comments about religious favoritism did not reflect a prevailing view among his employees. "I'm pretty close to my complex. I mean, I am talking with people every day. And so I felt like I had a fairly good pulse in terms of where people were at and what was happening. But I was concerned that it might be. And so when I had that concern, the first thought that came to my mind was . . . one of the best things that you can do is to get your senior producers together to get feedback

from them." After reviewing the results, Arave sent Holsinger an email indicating he was eager to discuss them.

On Wednesday, January 19, Greg Franks brought the survey results for Arave's complex to the attention of Wendy Wall in human resources.[4] Franks reported Holsinger said "the written comments carried a common theme of discrimination based upon religion. Many comments said he would only hire LDS employees and would not socialize with non LDS employees."[5] Franks asked Wall to take a look at the survey results for Arave's complex and another complex with similar problems, because "both complexes have had very poor performance on top of the poor survey responses." Franks testified he meant Arave's overall score was low compared to the scores of other complexes within Merrill Lynch and that the written comments were significant. Franks also asked Wall to call him to discuss further.

According to Franks, he decided Holsinger should meet with Arave to gather more information and develop a plan of response. He said the ultimate responsibility for coming up with a plan lay with Holsinger and personnel in the human resources department. He said he did not require Arave to address the perception of favoritism, did not instruct Holsinger to require Arave to apologize for religious favoritism, and would

---

[4] The parties agreed to have Franks testify through excerpts of his videotaped deposition because he was not available at the time plaintiff's counsel wished to introduce his testimony.

[5] This characterization obviously overstates the accusations, but the overstatement is not important to any issue on appeal.

not have supported an approach mandating an apology. However, Franks said he thought it would be an error in judgment for Arave to fail to address the comments with his employees. He said he suggested Arave "have a meeting and say look, apparently as you can see . . . there's a perception this is true. If that's the case, I take full responsibility and ownership of that. Let's talk about it, let's discuss it . . . [L]et's discuss this in an open forum, [whether] you really feel this way."

On Thursday, January 20, Wall wrote to Katherine Anderson and Mary Mack and sent them the comments on Arave's complex. She told them the comments contained allegations of religious favoritism, and asked them to find time the next week to discuss the issue. Anderson responded that the Advice and Counsel group in human resources, which investigated allegations of discrimination, had looked into a similar complaint about the complex from a financial advisor named Joanne Astle. The complaint included the accusation Arave favored members of his church in hiring and was more protective of them once they had been hired. Mack had been responsible for supervising an investigation into Astle's complaint. Ultimately, the investigation did not go forward because the person assigned to the case could not get in touch with Astle. Mack said she remembered concluding Astle's complaint was unsubstantiated, but said she reviewed the file before her discussion with Wall and Anderson.

The same day, Arave called a meeting of his senior financial advisors and shared the survey comments with them. Seven or eight financial advisors attended, including Joanne Astle. Arave said he called the meeting to see whether the comments about religious favoritism reflected a prevailing sense of employees in the office. "I was looking for their feedback to tell me, 'Brent, yes, this is—you've got a real problem here,' or, 'no, we don't think there is a problem.'" According to Arave, the financial advisors responded by saying they thought the comments "were bigoted, they were completely unfair, they were rash, they were unjustified." After the meeting, Astle told Arave she had not taken the survey, but Arave testified he did not believe her.

Afterward, two financial advisors who had worked with Arave for years wrote to Holsinger praising Arave and rebutting the survey comments. On the day of the meeting, Michael Harris wrote, "Brent shared some survey comments with a few of us this morning and I was surprised with what I heard. In my experience, I have never felt or perceived any of the negative experiences described in the comments . . . Brent has never favored anyone based on religion." Three days later, Rondi Edwards wrote suggesting the comments came from negative people and saying the survey comments were unfair to Arave and had their roots in difficulties executing the merger of BoA and Merrill Lynch.

Within an hour of receiving Harris's email, Holsinger forward it to Arave with the comment, "Hope the meeting he is referring to included the whole office and we can discuss your ideas on complex commun[ication]." Holsinger wrote to Edwards (copying Arave), "Unfortunately, we do not have the luxury of discounting remarks made in the

15

survey by assuming some folks are negative.  As leaders, we own the issue, and are charged with demonstrating sensitivity, genuine interest, and willingness to change in order to serve the interests of all.  We all have ownership and will get there together."

On Tuesday, January 25, Wall, Anderson, and Mack held a conference call to discuss the issue.  One option they discussed was to have the Advice and Counsel group perform a workplace assessment.  Another option was to have Arave address the comments in responding to the survey results, and talk about the perception of religious favoritism.  The three concluded a workplace assessment would be disruptive and damaging for Arave, so they chose to recommend having Arave address the comments in the first instance.  Wall said they decided Anderson should work with Arave to create talking points to address the comments.  According to Wall, they did not discuss asking Arave to apologize, and she would have considered it inappropriate to do so.  Wall said they discussed the prior complaint by Astle.  She said Advice and Counsel conducted an investigation and found no conclusive evidence of religious favoritism.  According to Mack, the three discussed whether Astle was the source of the survey comments.

The same day, Holsinger and Arave met and discussed the survey results.  Arave said it was the first time the two had met in person and the first time they discussed the religious favoritism comments.  Holsinger said the meeting was part of a series of meetings he held with complex directors to discuss business and survey results.  Arave came to the meeting with a presentation and prepared to discuss many topics, including his management style, his business results, and the substance of the survey comments.

16

He said Holsinger stopped him short and turned abruptly to the survey results. Arave told Holsinger he thought the perceptions of favoritism were not true and reflected the perceptions of one or two people, not the prevailing sense of the employees in the complex. Holsinger took Arave's response and his prepared presentation as defensive. From this point, their accounts of the meeting diverge widely.

Holsinger admitted he did not investigate to determine whether the complaints were true and emphasized BoA had promised the survey responses were anonymous and confidential. However, he said he told Arave he believed there was no favoritism, but still thought it important for Arave to address the perception of favoritism with his employees. Holsinger said Arave expressed discomfort addressing the comments about religion from the survey. However, according to Holsinger, Arave eventually agreed to the value of changing perceptions and the two discussed specific ideas for how to do so. Holsinger said he did not tell Arave what he needed to say to his complex and did not tell Arave he needed to apologize. Instead, he recommended Arave be open about goals and employees' accomplishments to reinforce productive behaviors and to give people confidence he was making employment decisions based on achievement alone.

According to Arave, however, Holsinger said he doubted Arave's opinion the comments did not reflect the opinions of a broad base of people in the complex. "And then he went on to say, 'in fact, you created a real problem in your complex. You're going to have to go to your offices and apologize for what you've done.'" According to Arave, "he told me that I was going to need to change the way that I do things, going to

17

need to change some of the things that I do personally, and that I was going to have to make this right because I'd put the complex at risk." He said Holsinger suggested they may have to stop recruiting from BYU. Arave says he told Holsinger, "I think these comments are harassing to me as an LDS member of the Church. I think they're— they're harassing to other people in our complex that are LDS," but Holsinger "just completely passed over that." The two agreed Holsinger said Arave should work with Katherine Anderson to develop an effective approach to discussing the issue with his employees.

Holsinger wrote Franks and Wall about the meeting the same day. "Two hours with Brent ended extremely well. He entered defensively and left engaged and committed to taking actionable steps to change perceptions from survey (Kathy Anderson will help shape strategy), refinement and restructuring his PMD program for heightened results, and restructuring his performance management/recognition process. I also added measurable results in competitive high quality hires. [¶] Greg, my guess is we have [a] '*technical failure*' as opposed to [a] fundamental problem. I think we can get this ship righted. Wendy, I will reach out to Kathy for her engagement with Brent."

Franks responded within an hour. "Sounds good. In my view, he may very well need to do a public mea culpa in front of his office in order for them to believe he has read the results and has taken them to heart. I have seen this before and it is very difficult to get buy in and to buy time without this type of response." Franks reminded Holsinger of the example of Dan Sontag, a former Merrill Lynch executive. Franks testified he did

18

not know the dictionary definition of the term "mea culpa" and said by suggesting Arave do a "mea culpa" he meant he should "[t]ake responsibility for the results of the survey, take ownership of it and address it in a public forum in a holistic manner." Holsinger responded he was "already there on the mea culpa. Asked him to work with Kathy and present message to me first as devil's advocate." Wall said based on this email she thought Arave agreed with the approach they advised.

At trial, Holsinger explained what he understood Franks to mean by suggesting Arave make a public "mea culpa." He said the reference related to something Sontag had done when he received negative confidential feedback from his regional directors. "Dan, to his credit, called everyone up, or all of the directors to one common location and stood in front of us all and shared the feedback that we provided. And it was clear that he wasn't happy about it, but he said, 'I'm committed to . . . making some changes so that you all feel differently.' And we gave him a lot of really candid feedback. And so that mea culpa, if you will, of Dan standing up in front of all of us and committing to improving earned a lot of respect from all of us and also helped Dan navigate his career positively and helped us deliver great results. But that was kind of . . . the mea culpa meeting." Holsinger said he believed following Sontag's example would help Arave lead the complex effectively.

Holsinger also wrote Anderson to tell her about the meeting. He told her she should assist Arave and suggested reaching out to him. Separately, Holsinger forwarded Franks' "mea culpa" email to her and reported "I convinced Brent in our meeting of the

need to 'own' the problem and accept his role in contribution to the perception." Later, Holsinger wrote Arave "I shared with Kathy A that you and she should probably speak on your communication plan." Arave wrote back to Holsinger, saying he thought the meeting was productive and he "came away with some good ideas." However, at trial he explained, "I was still shocked about [Holsinger] not having any communication with me about the issues. And—But he had shared with me some ideas about some things that we could do in the complex. I thought that was great. I was still trying to be positive and move forward even though I was very, very concerned about the conversation."

On Wednesday, January 26, Anderson reported to Mack that BoA senior management—which included Franks—had decided to hold off on engaging a workplace assessment team and "to work closely with Brent on an action plan and give him an opportunity to change the office environment and perceptions." She wrote, "If he is not successful in doing so over the next 90 days, we'll reach back out to you to discuss the workplace assessment approach."

Holsinger said he never found anyone to take the Orange County director's position, so he split it up into two smaller complexes. He posted a notice for those jobs on Thursday, January 27. Arave did not express interest in either of those positions.

**D.** *Efforts to Develop a Communication Plan with Katherine Anderson*

Wall directed Anderson to help Arave prepare talking points to address the survey comments. Anderson said she expected Arave to send her a presentation, but he never did. She said she had three telephone meetings with Arave to develop a communication

20

plan, the first around Monday, January 31. Their accounts of these meetings differed substantially.

According to Arave, on Monday, January 31, "I called Kathy Anderson and expressed to [her] again my concern about the . . . comments in the survey not being a reflection of a broad base of Advisors in my complex and again expressed to Kathy Anderson that I felt that those comments were both—were harassing to both myself as an LDS person and to other members of my complex who were LDS." Arave said he told Anderson that Holsinger had told him he "needed to apologize to the complex." He said Anderson ignored his complaint and expressed doubt Holsinger had asked him to apologize. They proceeded to talk about how to respond to other issues raised by the survey. Arave said he asked Anderson "[t]o help me with the talking points around what Joe had directed me to do, which was make an apology to my complex," but said she never did so.

According to Anderson, Arave broached his concerns on a call on Friday, February 4, not the previous Monday, but did so in a much more limited fashion. According to Anderson, Arave told her he thought the comments came from one or two people, he did not hire exclusively Mormons or from BYU, and he thought the comments were harassing. She said Arave did not complain Holsinger was making him apologize. Arave agreed the two talked on Friday, February 4. According to Arave, on that day he renewed his request for Anderson to send him talking points to help address the religious favoritism comments.

21

On Friday, February 18, Anderson sent Arave a draft of some talking points as "an attempt to try to get [the process] started." The draft included just one bullet point about the favoritism comments, which read, "Hiring Process: Some of you thought that there was some favoritism in who we are bringing on board." Anderson said she wrote the bullet point that way because Arave told her "he didn't want to show the comments themselves . . . He didn't want to mention his own religion." Arave said the document was inadequate because "it didn't cover how I was going to address the religious issues that [Holsinger] wanted me to apologize about to the complex." He explained, "I was instructed that I needed to apologize. I was looking for guidance about that apology. I never received any guidance in terms of making that apology."

The two did not speak again until Wednesday, March 23, by which time Arave had decided not to address the survey comments with his employees. Anderson was away on vacation for two weeks during the interval. Arave said Anderson was nervous on the call and said she was aware he had sent a demand letter to BoA complaining of discrimination since their last call. He told Anderson he was not going to talk about the religious comments with his employees. Anderson said he got emotional, and she told him it was fine not to address the comments. She said he talked about feeling like he was being asked to apologize for his religion and kept returning to the point. Anderson said she told him that was not true. According to Arave, Anderson reiterated addressing the religious favoritism comments was important. Arave said he told Anderson that Holsinger wanted him to apologize, but Anderson told him "it was not apologize, it was

22

apologize for a perception." Arave said he told her he was going to meet with his employees about other issues related to the survey and wanted the talking points she had promised.

### E. *Final Conflict Between Arave and Holsinger*

In the meanwhile, matters came to a head between Holsinger and Arave.

On Tuesday, March 8, the two met by telephone and discussed the fact Arave had not responded to the survey results. Holsinger said he stressed the seriousness of owning the survey results, including by addressing the comments on religious favoritism. He told Arave it was his duty as the leader of the complex to demonstrate sensitivity and behavioral changes. According to Holsinger, Arave said he did not know how to communicate the message concerning religion-based comments, and complained Anderson had not provided talking points. Holsinger said he did not insist Arave admit the religious favoritism comments were true. He also said he would not have recommended denying their truth outright, but would have given Arave the flexibility to approach the issue that way.

Arave's version of the discussion was somewhat different. He said Holsinger was heated on the call. He was upset Arave had not spoken to his employees about the survey results. He said Holsinger told him he was "painting [himself] into a corner," which Arave took as a threat. He said Holsinger said "it wasn't about my religion. He said, it's not important it's directed at you, it's important to get the message that you are open to the results and change the behavioral traits." He said Holsinger complained Arave had

23

created an LDS culture and was putting the organization at risk. Arave said he understood Holsinger to be threatening him. He said Holsinger said, "Do it my way or else . . . And I interpreted that as, you know, do it the way I'm telling you to do it or else."

According to notes Arave and his assistant took, Holsinger said he "did not like the idea that the meeting about the survey results had been put on hold for three months[6] . . . That this could create risk to the 'organization' . . . Not in agreement should have been communicated with the entire complex . . . (the tone in so many words . . . it was going to be done his way) . . . [B]ecause there was already a meeting with some of the [financial advisors] it was already out there and that [Arave is] sending a message that what people think is not important . . . 'you need to get over that this is directed to your religion . . . it is not about you [or] your religion' . . . 'not important if it is directed to you' . . . important to get the message that you are open to the results and change the behavioral traits . . . the LDS religion in the survey was mentioned 'you are naïve if you think it was by one or two people' . . . The culture needs to change . . . 'I want you to share this with every office.' . . . have a humble approach take full ownership . . . don't point fingers . . . show your transparency." Holsinger and Arave agreed the notes reflected the substance of what Holsinger said on the phone call. The notes say nothing about Arave needing to apologize, which he acknowledged at trial. Arave said Holsinger told him to apologize at the January 25 meeting.

---

[6] It had been less than two months.

The March 8 meeting was the last meeting Arave ever had with Holsinger as well as the last time they ever spoke.

## F. *Arave's Demand Letter and Resignation*

Arave had retained counsel on February 7. On Thursday, March 17, his attorneys sent a demand letter, addressed to Wendy Wall and the head of Merrill Lynch's wealth management business, complaining of religious discrimination and retaliation.

The letter reported Arave had experienced adverse employment actions which "deprived him of the benefits of his employment and created an intolerable and hostile work environment," and traced the problem to the employee satisfactions survey. "In or about August 2010, Merrill Lynch conducted an anonymous employee survey. Unbeknownst to Mr. Arave, the survey results contained anonymous discriminatory comments accusing Merrill Lynch of employing too many members of the LDS Church and falsely accusing Mr. Arave of 'preaching' Church doctrine in the workplace. These vicious and prejudiced comments appear, even to an untrained eye, to be from one or maybe two antagonistic and bigoted employees who utilized the anonymous survey to attack Mr. Arave because of his religious beliefs and practices. Such bigoted and hateful commentary should have been immediately and strongly rejected by Bank of America and not ratified. Mr. Arave, over his time at Merrill Lynch, has managed a diverse group of FAs and staff."

According to the letter, rather than address the discrimination by survey respondents, Holsinger and Anderson turned on him. The letter said Arave called Holsinger in January 2011 "to discuss his previous transfer request to Newport Beach," but "Holsinger responded by aggressively advising Mr. Arave that he would not consider him for transfer to Newport Beach due to the comments." It also accused Holsinger of demanding Arave hold a meeting with his entire office "to apologize for 'creating an environment of favoritism to his personal religious beliefs'" and later chastising him for failing to do so. According to the letter, when Arave told him "he was offended by the attack against him [based on] his religion," Holsinger told Arave to "'get over it' and demanded that Mr. Arave hold a meeting of his entire group and apologize for his religious beliefs for 'the benefit of the organization.'" The letter said Holsinger ultimately "instructed Mr. Arave that he had to change his LDS-like behavioral traits and made clear this was a condition of Mr. Arave's continued employment."

The letter said Holsinger assigned Anderson to work with Arave on responding to the comments. When she contacted him, the letter reported, she said "she would need to meet with Mr. Arave to review his talking points regarding his anticipated and mandatory apology to his group for his religious affiliation and beliefs" and advised him "she would email the talking points of his apology so that he could have a chance to review them before his meeting with her." The letter says Anderson never sent the promised talking points, and when Arave later "brought up the issue of religious comments and reported

26

that he felt they were hostile toward him, Anderson completely ignored his legitimate complaint."

Arave's letter warned BoA and Merrill Lynch that "Mr. Arave has been chastised, discriminated against, refused transfer/promotional opportunity and is now being ordered to publicly apologize for his religious affiliation and beliefs and to stop acting like an LDS member. This conduct constitutes unlawful harassment and discrimination by Bank of America toward Mr. Arave based upon his religion." The letter suggested resolving the dispute for $3 million (approximately five years of his salary and bonuses) and the proceeds of his stock plan, and proposed a noncompetition agreement for an additional $3 million.

Holsinger said Franks let him know about the letter and he ultimately received a copy of it. Holsinger denied the letter's accusations. He said he did not accuse Arave of preaching church doctrine at work, did not tell him to apologize for his religious beliefs, did not tell him to change his LDS-like behavior, and did not tell him changing his behavior was a condition for his continued employment. Holsinger said of this last charge, "It's a lie." Holsinger was told the firm would conduct an investigation and he should be sensitive in his interactions with Arave to avoid any suggestion of retaliation. He said he continued to treat Arave normally after the letter, including him in regional meetings and email exchanges. He said he did not attempt to discuss the survey results or Arave's communication plan after BoA and Merrill Lynch received the letter.

27

Anderson also saw the demand letter. She denied saying she would review his talking points to ensure they contained a mandatory apology. She said, "I was shocked because that's not what I was asking him to do at all. It wasn't about apologizing for whatever religion a person chooses to believe in or have." She also denied failing to send him talking points. "I did send him talking points, and I was surprised that he claimed he hadn't received them." According to Anderson, Arave had never accused Holsinger of demanding he apologize for his religion until the March 23 call—after the letter.

After the demand letter, Arave stopped participating in business calls that involved Holsinger. He missed two regional group conference calls between March 17 and March 28 and a performance planning call on March 29 because he was waiting for a response to his demand letter. Holsinger wrote Arave to say he noticed Arave had not been on the regional calls and it was not acceptable to miss them. Holsinger had scheduled planning calls on March 29 for all complex managers, including Arave. He said the calls were not performance reviews, and he did not intend to talk to Arave about the survey results. He said he did not intend to demote Arave on the call, and had never discussed demoting or terminating Arave. However, when Holsinger called him, Arave refused to take the call.

According to Arave, Holsinger's email about missing the regional calls left him "feeling harassed, intimidated. I had made a complaint to the firm. And the very person that I had made the complaint against was calling me, harassing me for not taking calls from him and not participating with him." Arave conceded it was his responsibility to be on those business calls, but said, "I think it was the firm's responsibility to find some way

28

that I could communicate without having to deal with Joe Holsinger." Arave resigned the same day without notice.

### G. *Arave's Accrued Vacation Time*

Arave said he accrued vacation time every year through 2009 while he was employed by Merrill Lynch. He said he took one week of vacation time to go to Shasta Lake with his family every year from 2006 to 2009, and he took another five or six days of vacation one of those years to go to Europe. BoA does not allow employees to accrue vacation time, so his accrual stopped as of January 1, 2010. Arave did not present any direct evidence of his accrued vacation time, however, and BoA introduced a report showing Arave had no accrued vacation time when he resigned. From his testimony and the fact Merrill Lynch capped accrued vacation time at eight weeks, he concludes he had eight weeks of accrued vacation time when he resigned. BoA went with its records, however, and refused to pay him for those hours. Arave sought compensation under Labor Code, section 201.

### H. *Trial, Verdict, and Award of Fees and Costs*

In May 2011, Arave filed a lawsuit in Riverside Superior Court, alleging seven causes of action against BoA, Merrill Lynch, and unnamed defendants:

(1) Religious discrimination (Gov. Code, § 12940 et seq., cause 1);

(2) Religious harassment (Gov. Code § 12940, subd. (j), cause 2);

(3) Retaliation (Gov. Code, § 12940, subd. (h), cause 3);

(4) Whistleblower retaliation (Lab. Code, § 1102.5, subd. (c), cause 4);

(5) Failure to prevent discrimination (Gov. Code, § 12940, subd. (k), cause 5);

(6) Wrongful termination in violation of public policy (cause 6); and

(7) Failure to pay wages (Lab. Code, §§ 201, 208, 227.3, and 2926, cause 7).

Arave named Holsinger and Anderson as individual defendants on the claim for harassment, cause 2. The trial court granted summary judgment on the harassment claim as it related to Anderson, an order Arave appeals. The trial court also granted summary judgment on the whistleblower retaliation claim, which Arave did not appeal.

A jury trial of Arave's remaining claims began on August 7, 2013. After the close of evidence, Arave voluntarily dismissed the claim for wrongful termination in violation of public policy, cause 6. On September 11, 2013, the jury returned a verdict in defendants' favor on all remaining claims. The jury found defendants did not subject Arave to an adverse employment action or constructively discharge him (cause 1), did not subject him to unwanted harassing conduct on the basis of his religion (cause 2), did not subject him to a material and adverse change in the terms and conditions of his employment after he complained of religious discrimination (cause 3), and did not fail to prevent discrimination (cause 5). The jury also found Arave did not have any accrued vacation time as of the date of his separation.

After trial, the trial court denied Arave's posttrial motions and awarded defendants, as prevailing parties, $54,545.18 in costs and $29,097.50 in expert witness fees, as well as $97,500 in attorney fees incurred defending against his wage claim. The court denied defendants attorney fees on Arave's FEHA claims on the ground the claims were not frivolous. We set out the details on the ruling on fees and costs in parts II.G. and II.H., *post.*

30

## II

## DISCUSSION

**A.** *Evidentiary Rulings*

Arave contends the trial court made a series of erroneous evidentiary rulings which deprived him of a fair trial. We review rulings on the admissibility of evidence for abuse of discretion, and reverse only where there is a clear showing the trial court exceeded the bounds of reason under all the circumstances. (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639-640.) Even where a trial court has erred, we will not reverse the judgment unless the error resulted in a miscarriage of justice—in this context, where appellant shows a more favorable result was reasonably probable absent the error. (Cal. Const., art. VI, § 13; *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332.)

> *1.  Order barring evidence Merrill Lynch treated other complex directors differently*

Arave contends the trial court abused its discretion by excluding certain evidence he was treated differently than other complex directors who had, in the past, faced accusations of discrimination. Specifically, he contends the court erred by excluding evidence that:

(1)  Franks and Holsinger had faced discrimination complaints and were not directed to address the complaints with all their employees;

(2)  Franks did not consider whether candidates for the regional managing director position he filled had faced discrimination complaints;

31

(3) Mack had never known another complex director asked to address his complex on issues related to his religion or religious beliefs; and

(4) Franks was not aware of any other complex director asked to address his complex on accusations of discrimination.

The trial court excluded the first two categories of evidence under Evidence Code section 352. Arave argued Franks and Holsinger had been accused of age and gender discrimination in complaints made to human resources, employment agencies, or courts, yet neither was "required to go to their entire complex, take ownership of it, and apologize for making people feel discriminated against." He contends that fact is relevant to show they treated Arave differently based on his religion.

In general, all and only relevant evidence is admissible. (Evid. Code, §§ 350, 351.) Evidence is relevant if it has any tendency to prove or disprove any disputed fact of consequence to the action—that is, if it "logically, naturally, and by reasonable inference" tends to establish a material fact. (*Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 125.) Limiting this principle, Evidence Code section 352 gives trial courts the discretion to exclude relevant evidence if its probative value is substantially outweighed by the probability admitting the evidence will require undue consumption of trial time or create a substantial danger of prejudice, confusing the issues, or misleading the jury. The trial court's discretion in making such calls is very broad; we will reverse only if its determination was "arbitrary, capricious, or patently absurd" and "resulted in a manifest miscarriage of justice." (*People v. Celis* (2006) 141 Cal.App.4th 466, 476.)

32

The trial court's decision to bar evidence regarding the discrimination complaints against Holsinger and Franks was not arbitrary. Arave did not suggest the complaints were sufficiently similar to the complaints against him to justify admitting them. His counsel represented they were individual complaints brought by specific employees based on specific instances of alleged misconduct. The complaints against Arave were entirely different. They suffused the comments section of an anonymous survey of all the employees in his complex and they addressed Arave's general approach in managing the complex, not his treatment of a specific person. It is reasonable to expect a manager to address complaints about a workplace environment by speaking with his employees as a group. It is not evident such an approach would even be acceptable as a way of addressing a single employee's specific complaint of discrimination. Because there was no suggestion the prior complaints raised pervasive problems, the trial court could reasonably have concluded the probative value of the prior complaints was, at best, minimal.

The trial court could also reasonably have concluded the ill effects of introducing the evidence substantially outweighed its minimal probative value. In the first place, the complaints were directed at two important defense witnesses. Though Arave purported to offer the prior allegations of discrimination to show he was treated differently than other accused complex directors, the jury may have considered it as relevant to deciding whether Franks and Holsinger were disposed to discriminate. Such "me too" evidence may be appropriate in certain contexts. (See *Johnson v. United Cerebral Palsy/Spastic*

33

*Children's Foundation* (2009) 173 Cal.App.4th 740, 767 [concluding evidence of pregnancy discrimination against other employees admissible to prove pregnancy discrimination in plaintiff's case].)  However, it is within the discretion of the trial court to exclude "me too" evidence where the discrimination involves a different protected class.  (*Hatai v. Department of Transportation* (2013) 214 Cal.App.4th 1287, 1297-1298, disapproved on another ground by *Williams v. Chino Valley Independent Fire Dist.*, (2015) 61 Cal.4th 97, 104.)  Here, introducing the other incidents of alleged gender and age discrimination would likely have confused the jury and consumed an undue amount of trial time, requiring minitrials on each of the prior complaints.  The trial court could reasonably have concluded on these grounds that the evidence should be excluded.  We therefore find no error.

As for the other two categories of evidence, the trial court acted within its broad discretion to sustain objections to Arave's questions to Mack and Franks whether they knew of other instances where complex directors were directed to address with their employees issues related to their religious beliefs or discrimination complaints.  The questions addressed to Mack were misleading because they asked her whether she knew of other cases where a complex director had been asked to address employees "relating to their own religious beliefs," or "on issues related to their religion," or "regarding complaints that related to their religion."  Though Arave sometimes spoke of being asked to address his religion with his employees, his claim is actually based on the requirement that he address accusations that he favored employees who shared his religion.  The

34

distinction is important, and the trial court did not err by sustaining objections to questions designed to elide it. The question to Franks about prior discrimination complaints also failed to recognize the important difference between asking a manager to address all employees on an issue raised about a pervasive management problem and a specific complaint by a specific employee. We find no error in sustaining the objection to those questions.

### 2. *Order barring evidence the survey was not anonymous*

Arave contends the trial court committed prejudicial error by refusing to allow him to ask two witnesses—Mary Mack and a complex director from Hawai'i—about certain demographic questions on the employee satisfaction survey. According to Arave, answers to those questions would have undermined defendants' assertion that the survey was anonymous, which they offered as a reason they did not investigate who made the comments alleging religious favoritism.

We find no error in barring Arave from obtaining answers to those questions. As the trial court held, if Arave wished to establish the survey responses were not anonymous, he should have and could have asked about the information complex directors and other BoA agents received from the third party contractor who conducted the survey and compiled the results. But Arave does not object that he was barred from learning about the information in BoA's possession. He objects he was barred from establishing the survey contained questions of a demographic nature. The trial court did not err in determining a jury could not, based on the fact the survey contained

35

demographic questions, reasonably infer BoA had received information from which it could have determined who made specific survey comments.[7]

In any event, the trial court did allow Arave to ask several such questions of Mack. Mack testified she took the survey in 2010. Arave's counsel asked whether she recalled responding to questions asking for: (i) the length of her employment with BoA, (ii) her status as a part-time or full-time employee, (iii) her seniority level within the firm, (iv) her gender identification, (v) her ethnicity, (vi) her disability status, (vii) her sexual orientation, and (viii) whether she was a member of the BoA Associate Affinity Group. Mack answered she did not recall to each question. Thus, the failure to introduce evidence the survey contained demographic questions through Mack traces to Mack's memory failure, not the intervention of the trial court.

### 3. *Order admitting prelitigation demand letter*

Arave contends the trial court abused its discretion by allowing defendants to introduce his March 17, 2011 letter to Merrill Lynch, which set out his complaints against the company and offered to resolve them in return for payment of five years' salary and bonuses and the proceeds of his stock plan. According to Arave, the letter was a prelitigation settlement offer made inadmissible by Evidence Code section 1154.

"Evidence that a person has accepted or offered or promised to accept a sum of money or any other thing, act, or service in satisfaction of a claim, as well as any conduct

---

[7] Arave contends defendants did not object to the introduction of this evidence on relevance grounds. The trial transcript shows he is mistaken.

or statements made in negotiation thereof, is inadmissible to prove the invalidity of the claim or any part of it." (Evid. Code, § 1154.) Admission of such evidence to prove invalidity of the claim is error. (*Moving Picture Etc. Union v. Glasgow Theaters, Inc.* (1970) 6 Cal.App.3d 395, 401 (*Moving Picture*).)

"It is well settled, however, that the rule which excludes offers of compromise does not apply to statements which are in nowise connected with any attempt of compromise or are statements of fact independent of an offer of compromise . . . [¶] In considering whether a person's statement amounts to an ordinary admission or constitutes an offer of compromise, the intention of the party is dispositive . . . [I]f the party making the proposal apparently *intended* to make *no concessions* but to exact all that he deemed himself entitled to, the proposal is an ordinary admission against interest and not an attempt to compromise." (*Moving Picture*, *supra*, 6 Cal.App.3d at p. 402; see also *Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1494 ["If the statement was not intended as a concession but as an assertion of ""'all that he deemed himself entitled to,'"" it is not an offer of compromise"].)

"[W]hen the issue involves evaluating particular facts and applying established law to those facts, to the extent the trial court's decision depends on the proper construction of sections 1152 and 1154 . . . the issue is a question of law, which we review de novo." (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476.)

37

Here, the letter, the pleadings, and the trial evidence all support the trial court's ruling; they establish Arave intended the letter as an assertion of the full extent of what he deemed himself entitled to receive. We first distinguish between the portion of the letter articulating Arave's claims from the portion setting out his monetary proposal for resolving those claims. The first part sets out the factual basis for claiming defendants harmed Arave. That portion of the letter does not concede any wrongdoing on Arave's part, but simply sets out Arave's accusations of discrimination. Indeed, Arave used the letter itself in his complaint as a factual basis for his retaliation claim, saying it was a "formal written complaint to [BoA and Merrill Lynch] regarding the religious discrimination, harassment, unlawful conduct and retaliation against him by Holsinger and Anderson."

The final section of the letter sets out a proposed resolution of the dispute, which monetized Arave's harm. Arave asked the trial court to redact that portion of the letter even if it admitted the first part, but the trial court refused. The letter says, "Based upon the hostile environment created by the foregoing events, Mr. Arave proposes that he exchange a voluntar[y] resignation of his employment for the following: [¶] . . . Payment of five (5) years of his income (salary and bonuses), including benefits (estimated $600,000 per year); his entire remaining Key Associate Stock Plan award . . . [¶] . . . Plus attorney fees and expenses."[8] Again, there is no concession on Arave's part.

---

[8] Arave also proposed defendants pay him an additional $3 million for his agreement not to compete.

38

The letter, on its face, sets out Arave's maximal claim, not a compromise position designed to reach a settlement. (*Moving Picture*, *supra*, 6 Cal.App.3d at p. 405 [holding the language of a letter showed defendant to be admitting the full measure of liability, not making an offer in compromise].)

The trial evidence supports this reading. Arave's damages expert testified he would be expected to work to the end of 2016 and receive total compensation of about $2.6 million. Thus, when it came time to prove up his claim, Arave asked for *less* than what he sought in his initial demand letter. We therefore conclude the trial court's ruling was not erroneous. The evidence supports a finding that Arave's letter was not an offer to compromise and is therefore not made inadmissible by Evidence Code section 1154.

In any event, even if the letter was an offer to compromise and the trial court erred in admitting it, we would find no prejudice. The factual claims in the letter are no different from the evidence Arave put on to prove liability, and the proposed resolution is consistent with the expert testimony Arave put on to prove his damages. We conclude excluding the letter would not have made it more likely the jury would have reached a more favorable result.

Arave's true complaint is defendants used the timing of the letter—and the date he retained counsel—to argue he concocted his claim to escape employment without losing his income. But, as we discuss in the next section, Arave opened the door on that issue.

## 4. *Order allowing evidence of the date Arave retained counsel*

Arave contends the trial court abused its discretion by allowing defendants to elicit testimony Arave retained counsel on February 7, 2011. He contends the evidence was irrelevant, prejudicial, and invaded the attorney-client privilege.

On cross-examination, defense counsel asked Arave, "[Y]ou hired an attorney as of February 7th, 2011, correct?" After defense counsel refreshed his recollection, Arave agreed. Defense counsel then asked, "So when you asked [your assistant] to transcribe your notes during the March 8 meeting" with Holsinger, "that was after you hired an attorney[?]" Arave responded, "Yes." Arave's counsel objected to both the initial and the follow-up question, and the trial court overruled both objections.

Defense counsel used the date Arave retained counsel on three other occasions. First, he asked Arave's assistant whether she was aware Arave had spoken to an attorney when he asked her to take notes on his March 8 call with Holsinger. She responded no. Second, he pointed out in closing argument that Arave had hired an attorney a month before the same March 8 meeting. Third, he pointed out Arave had hired an attorney only three days after his February 4 meeting with Anderson. In other words, defense counsel elicited and used the date Arave hired an attorney to suggest the March 8 meeting with Holsinger was not the final straw that led him to retain counsel, but that he had already taken an adversarial position earlier in the dispute.

The trial court did not abuse its discretion by allowing the evidence. The principal reason is Arave's counsel opened the door to the line of inquiry. As Arave points out, the trial court initially excluded the evidence in a pretrial ruling on a motion in limine. However, at trial, Arave and his counsel engaged in the following colloquy:

"Q. After the March 8th, 2011, meeting with Joe Holsinger, what was your understanding at that point of the requirement of you in addressing the complex on the survey results?

A. I — I didn't think it had changed since the first time that I met with Joe Holsinger.

Q. Okay. [¶] On or about March 17, 2011, did you direct a letter to be written by your attorney?

A. I did. [¶] . . . [¶]

Q. [D]id Kathy Anderson provide you with the talking points that you had requested relating to an apology?

A. No, she did not.

Q. Did she ever provide you with those talking points?

A. No, she did not.

Q. During your March 8th meeting with Joe Holsinger did you have any conversation with him about talking points from Kathy Anderson?

A. I don't think that came up in that March 8th meeting.

Q. *What made you hire an attorney by this point*?

A. Well, — And I'm not even sure the exact dates. But —

Q. Just what made you hire an attorney, is the question?

41

A.      I — I have a good friend who's an attorney, and I was very concerned about what was happening.  I shared with him what was being asked of me to be done.  And he told me that I needed to get legal – legal counsel."  (Italics added.)

Asked whether he felt a letter from an attorney was necessary by March 17, Arave responded he did because, "No one was listening to me.  There was absolutely no response to every one of my requests, and nobody cared what I was thinking or how I felt or nobody wanted to gather information at all about the situation."

These exchanges imply—without saying so directly—it was Anderson's conduct after the February 4 meeting and Holsinger's conduct at the March 8 meeting which triggered Arave's decision to seek legal counsel.  On that basis, the trial court reconsidered its ruling on the motion in limine, determined Arave had opened the door on the timing of his decision to retain counsel, and allowed the evidence that Arave had retained counsel on February 7.

We find no abuse of discretion.  Arave made the issue of the date he retained counsel relevant by suggesting he waited until thoroughly provoked to seek legal assistance.  By doing so, he opened the door to evidence he retained counsel early in this dispute to rebut Arave's implication.  (*Morris v. Frudenfeld* (1982) 135 Cal.App.3d 23, 32 ["appellant, having first 'opened the door' on this area, is estopped from asserting it as a ground for reversal, under the doctrine of invited error"].)

42

##### 5. *Order barring testimony that financial advisors are the appropriate persons with whom to discuss issues like the survey comments*

Arave contends the trial court erred by excluding Franks' testimony confirming it was appropriate for Arave to discuss the survey comments with his top financial advisors. He contends the evidence was relevant because Holsinger criticized Arave for discussing the comments with a subset of his employees, rather than everyone in his office and complex.

Franks was not available to testify at the time Arave's counsel wanted, so the parties introduced his testimony to the jury through excerpts of his deposition. As a result, we have the precise testimony the trial court barred the jury from hearing, which we set out here.

"Q.    Are you aware that Mr. Arave addressed the survey comments which you and Ms. Wall summarized as indicating religious favoritism with all of his leaders within the complex?

[Objection]

A.    First, we said there was a perception of unfairness. We don't know if it was true or not, so, and I don't know if he brought it up with his leadership team or not.

Q.    So you were never given information that Mr. Arave met with his leadership team, addressed the issues of the comments in the survey which were described by you and Ms. Wall as a perception of religious favoritism and was assured by the leaders within his complex that that was not a complex-wide opinion?

[Objection]

43

A.   I was not aware of that, but that's why we require people to discuss it with the actual financial advisors.

Q.   And –

A.   It was the leadership team reports to him and he determines their bonuses, so that's really not the way we choose to go about that.

Q.   Were you aware that Mr. Arave met with a group of his FAs and addressed the issue?

[Objection]

A.   I'm not aware what actual steps were taken."

The trial court sustained defendants' objections that the questions lacked foundation and assumed facts not in evidence. We see no abuse of discretion. Even assuming the court did abuse its discretion, any error was harmless. As we read the transcript, Franks offered his opinion that Arave should have addressed the issue with all of his financial advisors, not a subset of them. Thus, the excluded testimony does not endorse Arave's conduct, as he suggests, and barring it did not undermine his position. (*People v. Marlow* (2004) 34 Cal.4th 131, 152.) It is telling, in this connection, that Arave argues only that the ruling was erroneous, not that it prejudiced him.

### 6.   *Miscellaneous additional unspecified errors*

Arave contends the trial court "made countless additional erroneous rulings," which establish the court repeatedly ruled erroneously and inconsistently and thereby admitted irrelevant and prejudicial evidence while excluding relevant evidence and

44

breaking up the flow of his counsel's examinations. These errors, he says, deprived him of a fair trial.

To support his contention, Arave provides a list of 186 purported examples of error—nearly two pages of dense transcript page and line citations. What Arave does not provide, however, is any description of the rulings. Nor does he include any explanation of why we should conclude the rulings were mistaken or are significant enough to support overturning the jury's verdict. By failing to develop these arguments, Arave has failed to carry his appellate burden of establishing the trial court abused its discretion to his prejudice. (See *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 ["[w]hen an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary"]; *Saxena v. Goffney*, *supra*, 159 Cal.App.4th at p. 332 [appellant's burden to show evidentiary ruling constituted a prejudicial abuse of discretion].)

Arave complains the "trial court's erroneous rulings are too numerous to analyze within the word limitations of this brief." However, there are acceptable and helpful ways to convey the nature of a set of objections in abbreviated fashion. Providing a string citation of 186 points in a 13-volume transcript is not one of them. In any event, we have reviewed the entire trial transcript in the process of reviewing Arave's other claims of error and found no significant evidentiary errors.

**B.** *Defense Counsel's Conduct*

Arave contends defense counsel committed several acts of misconduct that amount to irregularity in the proceedings. He contends absent the irregularities, it was reasonably probable he would have obtained a more favorable result.

1. *Defense counsel's purported violation of orders limiting evidence of prior instances of discrimination*

Arave complains defense counsel asked questions violating the trial court's rulings on pretrial motions in limine barring evidence of prior instances of discrimination.

Plaintiff filed a motion to exclude evidence of allegations Arave had discriminated against an Asian employee (Plaintiff's MIL No. 1) and an African-American employee (Plaintiff's MIL No. 2) based on race. Defendants filed a motion to exclude evidence of allegations Holsinger and Franks had discriminated against employees based on gender and age (Defendants' MIL No. 2) and BoA and Merrill Lynch had discriminated against other employees based on their Mormon religion (Defendants' MIL No. 4). The trial court granted all four motions without prejudice, subject to the parties' ability to establish admissibility at an Evidence Code section 402 hearing.

At trial, defense counsel engaged in the following colloquy with Arave:

"Q. Mr. Arave, you testified yesterday that you were shocked to read the comments in the survey. Do you remember that?

A. Yes.

Q. In fact there was an anonymous letter sent to Merrill Lynch in 2003 complaining that you made hiring decisions based on religion.

[Objection and ruling]

46

A. There was a complaint. I don't know whether that was what it was about. I mean, specifically. There were a lot of issues in that letter."

Defense counsel then established through Arave's deposition testimony that he knew there was a perception he favored Mormons in his hiring decisions dating back to 2002 or 2003, when an employee filed a complaint saying he hired too many people from BYU. Arave's counsel objected to the line of questioning on the ground it was not impeachment and to the introduction of the deposition testimony on the additional grounds it was not relevant, the potential for prejudice substantially outweighed its probative value, and the opening question lacked foundation.

Arave's counsel did not, however, object that the line of questioning violated the court's motion in limine orders—and for good reason. None of the rulings on the parties' motions in limine barred defendants from introducing evidence that Arave had in the past been accused of discrimination based on religion. Arave's motions sought and obtained rulings that defendants could not introduce evidence of *specific* past accusations of racial discrimination. Defendant's motions sought and obtained rulings that *Arave* could not introduce evidence of *specific* past accusations various *defendants* had discriminated based on age, gender, and religion. None of these rulings barred defendants from asking Arave whether he was aware he had been accused of religious favoritism in 2003 after he claimed he was surprised by similar accusations in 2010.[9] Arave's claim that defense counsel committed misconduct by asking those questions is therefore baseless.

---

[9] Though he complains about the trial court allowing this testimony, Arave has not appealed the substance of the trial court's order allowing it.

## 2. *Defense counsel's purported violation of the order barring evidence of the date on which Arave retained counsel*

Arave complains defense counsel asked questions violating the trial court's ruling on a pretrial motion in limine that barred evidence of the date Arave retained counsel in this case. Arave filed a motion to exclude such testimony (Plaintiff's MIL No. 3) and the trial court granted it on the ground the evidence was not relevant.

As we discussed above (part II.A.4.), defense counsel asked Arave about the date he retained counsel after Arave's counsel had raised the issue. Arave's attorney asked a question implying Arave had retained counsel after the March 8 meeting with Holsinger. In fact, he had retained counsel a month before that meeting. Defense counsel asked Arave whether he remembered the earlier exchange, and, when Arave expressed confusion, asked directly whether he hired his attorney on February 7, 2011. Arave's counsel objected that the question violated the court's order, and the court overruled the objection. Ultimately, Arave admitted he had hired counsel on the earlier date.

Arave argues it was prejudicial misconduct to ask him about the date he retained counsel in the face of the ruling. Even if defense counsel should have cleared the line of questioning with the trial court before proceeding, we cannot find prejudice. As we discussed in part II.A.4., Arave's counsel opened the door to the line of questioning and the trial court properly allowed defense counsel to engage in the line of questioning. Thus, it is not reasonably probable Arave would have succeeded in excluding the evidence, much less obtained a more favorable result at trial had defense counsel asked permission to enquire before doing so.

48

### 3. *Defense counsel's purported character attacks, misstatements of law and facts, and appeals to the jury's sympathy, passions or prejudice*

Attorneys have wide latitude to discuss the case during closing argument. An attorney has the right to state fully his or her views on what the evidence shows, and the conclusions to be fairly drawn from the evidence. "'""The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury."'" [Citations.] "Counsel may vigorously argue his case and is not limited to 'Chesterfieldian politeness.'" [Citations.] "An attorney is permitted to argue all reasonable inferences from the evidence . . ." [Citation.] "Only the most persuasive reasons justify handcuffing attorneys in the exercise of their advocacy within the bounds of propriety.'"'" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795.)

"An attorney who exceeds this wide latitude commits misconduct. For example, '[w]hile a counsel in summing up may indulge in all fair arguments in favor of his client's case, he may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences.' [Citation.] Nor may counsel properly make personally insulting or derogatory remarks directed at opposing counsel or impugn counsel's motives or character." (*Cassim v. Allstate Ins*. *Co*., *supra*, 33 Cal.4th at p. 796.)

Arave contends defense counsel violated these principles by "appeal[ing] to the jury's sympathies, passions and prejudices and attack[ing] the character and motives of Arave and his counsel by attributing nefarious and dishonest actions to them."

Specifically, Arave contends defense counsel crossed the line by arguing:

- Arave "decided that instead of leading his way through this challenge he would blackmail Bank of America, make allegations of religious bigotry, threaten to sue, and demand millions of dollars."

- The jury has "the power to determine whether Mr. Arave deserves millions of dollars for quitting his job or whether instead he deserves to be taught that the law protects workers from discrimination and harassment and that that law cannot be manipulated and turned inside out by people like him."

- Merrill Lynch was trying to help Arave "even as late as March 8th" though "Arave hired a lawyer on February 7th. So about a month before this [March 8] conversation. And after hiring a lawyer, he started to have his assistant secretly sit in and take notes."

- "Mr. Arave was in control of the message and of the timing of the message . . . [but] at some point he became adversarial and antagonistic. And the decision to become adversarial and antagonistic was not triggered by religious intolerance. It was triggered by something else."

- "Was he told to stop recruiting or hiring Mormons or BYU graduates? . . . He claims that's what he felt . . . That's a personal problem. It has no place in this courtroom. Because what you're here to decide is whether religious animosity, religious intolerance drove the decisions."

- "March 17th is the first time he actually complained about" Merrill Lynch asking him to apologize for his religion and he did so "in a letter that was lousy with inaccuracies and lies."

Contrary to Arave's argument, these are all instances of permissible attorney argument. All are based on evidence introduced at trial. And the attorney's inferences have a reasonable basis in those facts. Nor did defense counsel impugn Arave's counsel. Instead, he suggested Arave was either dishonest or deluded in his presentation of the facts, presumably both to his attorney and on the stand in front of the jury. It is

50

permissible for an attorney to defend his or her client from an allegation on the ground that circumstantial evidence shows the allegation was fabricated. (*Rogers v. Foppiano* (1937) 23 Cal.App.2d 87, 95 ["An attorney has a right to reason fairly from the evidence adduced that a witness has either misstated the facts or that he has sworn falsely"].) And though defense counsel said the March 17 letter written by Arave's counsel contained "inaccuracies and lies," the letter set out Arave's complaints as he reported them to his attorney. It does not purport to set out the attorney's own beliefs. In short, we find no basis for finding these arguments constituted anything other than permissibly zealous advocacy.

Arave also contends defense counsel committed misconduct in his argument about who hired the person who conducted an investigation into Arave's complaint. The trial court barred testimony that defense counsel, rather than Merrill Lynch, had hired the investigator. Arave says the investigator testified at a deposition that he delivered his report to and received payment from defense counsel. Nevertheless, defense counsel said testimony by defendants' expert witness which suggested the investigator "was acting on defense counsel's behalf 'was taken out of context.'" According to Arave, this statement was misconduct because the trial court had excluded evidence Arave could have used to rebut it and also because defense counsel knew it to be false.

Arave has not articulated a basis for finding defense counsel's remark to be a falsehood. Asked whether the investigation "was an investigation by an attorney providing advice to Bank of America about the magnitude of the problem for achieving

51

resolution or litigation," defendant's expert testified, "I don't know that it started out that way, but I know that after Mr. Arave quit, he continued with a form of the investigation that definitely fits that." Defense counsel sought to neutralize the suggestion that the investigator was simply preparing for litigation when he attempted to interview Arave. It was fair of defense counsel to point out the expert did not accept Arave's characterization of the investigation as of the time of the failed interview. Moreover, since defense counsel was referring to the expert's testimony, Arave's counsel was free to propose an alternative understanding of the testimony.

Finally, Arave puts forward a string citation of additional purported instances of misconduct, unsupported by argument or legal citation. As we explained above, Arave bears the burden of proving the errors he asserts on appeal. A list of citations to the record does not suffice to carry that burden. (*Landry v. Berryessa Union School Dist.*, *supra*, 39 Cal.App.4th at pp. 699-700.)

### C. *Trial Court Bias*

Arave contends "the trial court's prejudice and bias pervaded the entire trial and resulted in an atmosphere that was not impartial or fair," which, he says, requires this court to reverse the judgment. Specifically, Arave complains the trial court's "misconduct includes the rude and discourteous manner in which the trial court treated Arave, his counsel and his witnesses, the comments and facial expressions repeatedly made while such individuals were addressing the jury or court and/or testifying and its grossly disproportionate, one-sided and contradictory evidentiary rulings."

52

It is extremely difficult to establish judicial misconduct has risen to the level that requires a new trial. "Although the trial court has both the duty and the discretion to control the conduct of the trial [citation], the court 'commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution.' [Citation.] Nevertheless, '[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.' [Citation.] Indeed, '[o]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the party] a fair, as opposed to a perfect, trial.'" (*People v. Snow* (2003) 30 Cal.4th 43, 78.)

### 1. *Chastising Arave's counsel for reading from exhibits*

Arave complains first that, though counsel for both parties read from documents when questioning witnesses, on three occasions "it chastised Arave's counsel in front of the jury for doing so."

The first incident occurred when the trial court interrupted Arave's counsel as she questioned Katherine Anderson about an email she received from Mary Mack.

"Q.   By this e-mail Mary Mack indicated to you that: The good news is we have some pretty specific perceptions detailed in the comments. Do you see that?

A.   Right. Yes.

53

Q. During your conversations with Mary Mack did she tell you that her interpretation of the survey results was that the comments regarding religious favoritism were specific to hiring?

[Hearsay objection sustained]

Court: Counsel, we've talked about this as reading from the e-mails. I'm going to direct you not to read from the e-mails. You may inquire of counsel about the e-mails."

Counsel proceeded to ask Anderson about the exchange with Mack without interruption.

Later, outside the presence of the jury, Arave's counsel objected to the trial court's direction. The trial court explained, "If I said that, I don't want you testifying. And when you're reading these things, you're, in essence, testifying. And that's what I want to avoid." Counsel maintained her manner of questioning was appropriate on cross-examination and objected defense counsel was using the same method of questioning. The trial court maintained the approach was not an effective way of communicating with the jury, but said both parties would be allowed to read from exhibits. When the jury returned, the trial court informed the jury that "I am going to allow both counsel to read from whatever they wish to read from in terms of exhibits."

The trial court objected to Arave's counsel reading from exhibits on two later occasions during the testimony of Mary Mack. First, the trial court cut counsel short as she read a series of demographic questions from the employee survey to find out whether Mack had answered them when she took the survey.

"Q. If you would look at Exhibit 979-3. For the 2010 Bank of America Employee Survey do you recall being asked how long you had been employed with the Bank of America?

54

A. Am I supposed to see that question on here? Or are you asking me?

Q. I'm asking you if you recall being asked—answering that question in the 2010 employee survey?

A. I don't recall.

Q. Okay. Do you recall answering the question whether you were full-time, part-time, or hourly?

A. I do not recall.

Q. Do you recall answering the question as to what band employee you were?

A. No. I'm sorry. I don't recall."

Counsel asked five more such questions before the trial court interrupted, asking "Are we going to go through every one of these questions . . . for her to say she doesn't recall?" Counsel asked one more related question, and then moved on to a different topic.

Second, the trial court interrupted Arave's counsel as she questioned Mack about an exhibit containing notes about a prior complaint about Arave.

"Q. [D]oes Exhibit 1011-1 reflect the notes taken by Advice and Counsel with respect to a call from Joanne Astle?

A. Yes, it does. [¶] . . . [¶]

Q. And the notes indicate that the employee was concerned about "appear FA using profanity," correct?

A. Yes, I do see that. This actually represents the call from Kathy Anderson to Advice and Counsel.

Q. . . . And is that testimony based on the fact that it says "call from HRM Kathy Anderson"?

55

A. Yes, it does.

Q. And below that it says, "HRM received a call from complainant, Joanne Astle," correct?

A. Yes. This is representing a call from Kathy Anderson to Advice and counsel to . . . [r]elay[] these concerns. [¶] . . . [¶]

Q. And then she indicates that "Joanne had concerns about Brent's recruiting activities, FA." Correct?

A. I see that.

Court: Is this a reading exercise? You're just reading from the – you're just reading from this and asking her if that's what you read."

These are extremely minor incidents. As our Supreme Court has indicated, "manifestations of friction between court and counsel, while not desirable, are virtually inevitable in a long trial." (*People v. Snow*, *supra*, 30 Cal.4th at pp. 78-79.) This trial was five weeks long, finishing the trial in a timely fashion was an issue, and the trial court evidently found counsel's manner of questioning neither effective nor efficient. But when counsel objected to the trial court directing her not to read from exhibits, the court reversed its instruction and told the jury it had done so. The two later incidents appear to relate to the trial court's understandable concern that counsel was wasting time by failing to ask direct questions. Contrary to Arave's position, these comments do not amount to expressing "negative personal views concerning the competence, honesty, or ethics of the attorneys in a trial." At worst, they are expressions of frustration at counsel's use of trial time. Even accepting Arave's representation that the court did not make similar objections to similar questioning by defense counsel, we do not believe

56

these minor reprimands were "'so prejudicial that [they] denied [Arave] a fair, as opposed to a perfect, trial.'" (*Id.* at p. 78.)

### 2. *Refusing to rule on Arave's counsel's objections*

Arave contends the trial court prejudiced his right to a fair trial by failing to rule on two of his evidentiary objections. We see no failure on the part of the trial court.

First, Arave contends the court did not rule on his objection to defense counsel playing a portion of Arave's deposition for the jury in opening statement. We have reviewed the record and conclude counsel did not effectively make a motion to exclude. Arave's counsel said only that she had an objection to defense counsel playing one of the proposed video clips. The trial court indicated it did not have the page and line citations and did not know the nature of Arave's objections. "Typically I have a deposition transcript, there's an objection—it's highlighted in one color, the objection, hearsay, foundation, whatever, and the response and ruling. So I have no way of knowing what that's about." The court and the parties moved on to other objections to defense counsel's opening presentation without providing the court with a transcript of the deposition or Arave's specific objections. When Arave's counsel later objected to the use of the deposition clip, she again failed to articulate a basis for the objection. Thus, we conclude Arave's counsel did not succeed in presenting a motion on which the trial court could rule.

Second, Arave objects the court did not rule on a motion to exclude testimony from financial advisors in Arave's complex on the perception he favored members of his religion. We read the record differently. After hearing argument, the trial court said "it seems as though that's been the—this case from the beginning, is Mr. Arave doesn't believe there was such a perception. And defense's position is, true or not, there were people that held this perception, and the perception needed to be addressed, true or not." In our view, the court here indicated the evidence was relevant and would be allowed. Arave's counsel objected further that the proposed testimony was designed to show what Merrill Lynch and BoA would have found if they had conducted a proper investigation, and the trial court said it would take a look at the issue. We understand the court's comment to indicate it would think about reconsidering its ruling. When the issue arose again, Arave's counsel did not renew the motion, but "ma[d]e note of the objections filed with the court previously by way of motion." When it allowed the financial advisors to testify on the issue, the court effectively refused to change its ruling. Thus, we conclude the trial court did rule on the motion, and we see no basis at all in this exchange for finding bias.

### 3. Difference in treatment of witnesses

Arave contends the trial court demonstrated bias by treating his witnesses differently than the defense witnesses. Specifically, he contends the trial court allowed Holsinger, Anderson, Wall, Mack, and Duffy to provide "rambling, non-responsive answers," but repeatedly struck as non-responsive answers Arave and his expert witness

gave in their testimony. We have reviewed these instances and find no basis for finding judicial bias or prejudice to Arave.

### 4. *Unfair treatment of Arave's counsel*

Arave contends the trial court subverted the trial by speaking to Arave's counsel in an "openly rude and demeaning" manner and holding her "to different standards than Defendants' counsel." We disagree.

In support, Arave gives several examples of putative judicial misconduct. We have reviewed each example and find them to be minor, even allowing for the fact that we cannot discern tone from a transcript. Arave points us to incidents that formed the basis of his challenge to the court's conduct which we discussed in part II.C.1. and defense counsel's conduct which we discussed in part II.B.3. We find nothing there to give us concern about the trial court's treatment of Arave's counsel. (*People v. Farley* (2009) 46 Cal.4th 1053, 1110 ["'[A] trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review'"].)

In addition, Arave cites the following exchanges as instances of demeaning judicial conduct. First, the following exchange occurred when counsel was questioning Joseph Holsinger about his 2011 performance review:

"Q. The review that you received after taking on the Regional Managing Director position that was between the second and third quarter of 2011, would you agree that if the end of the second quarter is June and the beginning of the third quarter of July that it would have been in that time frame?

59

[Objection, argumentative, misstates the witness's testimony]

Court:  *Why don't you rephrase your question.*

Q.  I'm trying to find out –

Court:  *Just ask the question.*

Q.  Between the second and third quarter of 2011 you received a review from Greg Franks, right?  (Italics added.)

Second, when counsel was questioning Katherine Anderson about the talking points she prepared for Arave, the following exchange occurred:

Q.  Did you ever provide an update of Exhibit 757-1 and 2 to Brent Arave with additional talking points beyond what you've shown us here on the religious-related comments?

A.  I didn't send him anything else after this –

Q.  Your first –

Court:  *Could she finish?  I'm sorry.  I didn't hear the last of your answer.*

A.  Yeah.  I was just saying I didn't send him anything else after this because I went on vacation, came back, we tried to reconnect, we didn't.  (Italics added.)

Third, when counsel was questioning Wendy Wall about defendants' answers to interrogatories, which Wall verified for the corporation:

Q.  So let me first ask you to look at the last page of the responses I've just handed to you and tell me if that is your signature on the verification?

A.  Yes, it is.

Q.  Okay.

60

Court:	*Well, . . . we don't need it.  If she says it refreshed her recollection, ask her the question.*  [¶] . . . [¶]

Q.	Ms. Wall, during – in this response, amended response, on Page 5, the page that I flagged for you, you indicate that you're providing the total number of employees hired or transferred into –

Court:	*Stop, please.  Just ask her the question again that you asked her originally.  Her answer was, "I don't recall."*  (Italics added.)

These are examples of a trial court exercising its discretion to guide the trial, directing counsel to allow witnesses to finish their answers, and directing counsel to cut to the chase in questions and away from needless complicated setups.  It is frankly difficult to see these incidents as providing a legitimate basis for appeal.  They certainly do not rise to the level of judicial misconduct warranting a new trial.

The remaining incidents Arave complains about are, if anything, less serious.  Arave complains the trial court "allowed defense counsel to point fingers at Arave's counsel and argue that she did something wrong while repeatedly telling Arave's counsel that the trial court does not want to hear 'I'm good and he's not good.'"  It is evident from the record that counsel had difficulty cooperating at trial and the trial court expressed some frustration with that fact.  But all the examples Arave cites occurred outside the hearing of the jury, most of them before the jury was seated, and so could not have affected the trial.  Moreover, on the merits, there was nothing at all objectionable about the exchanges.

61

Arave objects the trial court showed its bias by "[f]orcing Arave's counsel to shave a half-day off her case and told her she was taking too much time" and by giving defense counsel "an extra 15-20 minutes for his closing after telling Arave's counsel during closing that she only had 5 minutes left, when she really had approximately 15 minutes left." Respectfully, this was a five-week trial. We have reviewed the entire transcript, and in our judgment it was longer than it needed to be. What Arave complains about here is the trial court's exercise of its broad discretion to guide litigation. We see no basis in these examples to find the court abused its discretion, much less that it exhibited judicial bias warranting a new trial.

### 5. *Unprofessional facial expressions*

Finally, Arave contends the trial court's manner of addressing Arave's counsel's arguments and objections "left no doubt about the trial court's disdain for Arave, his counsel and his witnesses." He complains "when ruling against Arave on evidentiary objections, it would do so in a cheery voice" and throughout the trial "made inappropriate facial expressions and gestures . . . such as rolling its eyes, grimacing, shaking its head, pursing its lips, sighing and making looks of disgust." According to Arave, this conduct "deprived Arave of the fair and impartial trial to which he was entitled."

It is obviously difficult on the paper record we receive on appeal to assess accusations that a trial court made inappropriate gestures in front of a jury. (*Bakman v. Department of Transportation* (1979) 99 Cal.App.3d 665, 686 ["Those not present at the hearing cannot judge such matters as facial expressions and oral nuances"].) For that

62

reason, it is critical for a litigant who believes a trial court is engaging in such misconduct to object immediately, thereby putting the court on notice of the need to correct its behavior and creating a record of the problem for appellate review.  In cases where the litigant believes the conduct indicates judicial bias or threatens the fairness of a trial proceeding, the appropriate response is a prompt motion for disqualification under Code of Civil Procedure section 170.1, subdivision (6)(B), which provides "[b]ias or prejudice toward a lawyer in the proceeding may be grounds for disqualification."[10]  Arave did not create such a record in this case, and therefore has failed to establish judicial bias.  In any event, we have reviewed the transcript and find nothing to suggest judicial bias, much less anything that would draw into doubt the fairness of the trial.

### D. *Instructing the Jury it Could Not Find Discrimination Based on Survey Comments Alone*

Defendants sought to have the trial court exclude evidence that the survey comments accusing Arave of religious favoritism were themselves discriminatory or harassing.  The trial court refused to exclude evidence, and defendants later sought to have the trial court instruct the jury on the role the comments could play in deciding whether BoA and Merrill Lynch discriminated or harassed Arave.  Ultimately, the trial court instructed the jury that "Merrill Lynch/Bank of America cannot be liable for

---

[10]  We note a determination on the question of disqualification may be reviewed only by a writ of mandate (Code Civ. Proc., § 170.3, subd. (d)), though a constitutional challenge asserting judicial bias can be raised on appeal.  (*People v. Chatman* (2006) 38 Cal.4th 344, 362.)

discrimination or harassment based solely on the fact that the survey comments were made."

Arave contends giving the instruction constituted prejudicial error because it "served no useful purpose other than to potentially confuse and/or mislead the jury into believing that they could not consider the Survey comments in evaluating Defendants' liability." "'The meaning of instructions is tested by "whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel."'" (*Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 462 [*as modified* Aug. 11, 2010, *as modified on rehg. den.* Sept. 8, 2010].) We see no such likelihood here.

The clear purpose of the special instruction was to ensure defendants were not held liable for discrimination or harassment based on finding the survey comments were discriminatory or harassing, even if none of the defendants' conduct in response to the comments was discriminatory or harassing. Contrary to Arave's argument, the special instruction very plainly allows the jury to consider the comments, evaluate whether they were discriminatory or harassing, and consider their conclusion in that connection in evaluating defendants' response to the comments. The instruction simply told the jury it could not find defendants liable if the comments were the only objectionable conduct. We conclude the trial court did not err in so instructing the jury.

64

## E. *Insufficient Evidence*

### 1. *Finding of no adverse employment action*

Arave contends the jury's verdicts on his discrimination and retaliation claims were not supported by substantial evidence. He points to the jury special verdict form, which indicates the jury found on each of those counts that defendants did not subject Arave "to an adverse employment action." He argues that the jury was compelled to find an adverse employment action because defendants admitted they decided not to interview him for a promotion, which constitutes an adverse employment action as a matter of law.

We begin by noting the same activities constitute adverse employment actions whether for purposes of a discrimination claim under Government Code section 12940, subdivision (a) or retaliation claim under Government Code section 12940, subdivision (h). (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1050-1051.) In either context, "an adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." (*Id.* at p. 1052.)

As the Supreme Court explained, the antidiscrimination provision "protects an employee against unlawful discrimination with respect not only to so-called ultimate employment actions such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an

65

employee's job performance or opportunity for advancement in his or her career. Although a mere offensive utterance or even a pattern of social slights by either the employer or coemployees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment for purposes of section 12940(a) (or give rise to a claim under section 12940(h)), the phrase 'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at pp. 1053-1054.)

The trial court instructed the jury, "There is an adverse employment action if Merrill Lynch/Bank of America has taken an action or engaged in a course or pattern of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Brent Arave's employment. An adverse employment action includes conduct that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion. However, minor or trivial actions or conduct that is not reasonably likely to do more than anger or upset an employee cannot constitute an adverse employment action."

Arave contends that under this test, Holsinger committed an adverse employment action when he refused to interview Arave for the job as director of the large Orange County complex. We do not find the test to be so categorical. The jury found no adverse action under this instruction in relation to both the discrimination and retaliation claims.

66

We review its finding for substantial evidence—viewing the record in the light most favorable to defendants, and resolving evidentiary conflicts and indulging reasonable inferences in support of the judgment. (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308.)

Arave cannot salvage his retaliation claim by reference to Holsinger's decision not to interview him. Even if that decision were an adverse employment action as a matter of law, it cannot be such for purposes of his retaliation claim. A retaliation plaintiff must show there is a causal link between a protected activity and the employer's action. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476.) Here, the protected activity was Arave's complaining about or opposing discriminatory or harassing conduct. But it is uncontested Holsinger told Arave he would not consider him for the Orange County director's position on January 18, *before* Arave had read the survey comments. Indeed, Arave testified Holsinger did not mention the religious content of the comments on the January 18 call. Thus, there is no basis for concluding the decision not to interview Arave was retaliation for Arave's complaint about or opposition to the comments. Since Arave does not identify any other reason for concluding the jury's finding was without support, we will affirm the verdict as to the retaliation claim.

As for the discrimination claim, substantial evidence supports the jury's finding. The evidence at trial about the Orange County position was the position had been vacant for some time when Holsinger entered the job knowing it was his responsibility to fill it. Holsinger learned early of Arave's interest in the job and mentioned his interest to his

67

supervisor. But he also mentioned he was considering whether the better solution might be to divide the very large territory up and have two people manage it. As of January 4, Holsinger had not decided what he was going to do. But after he received Arave's survey results, both quantitative and qualitative, he decided Arave was not the person for the job. Arave admitted he was in the bottom 40 percent of firm-wide directors for 2010 and that his PMD score was the sixth worst out of 49 markets. In the end, Holsinger did not find anyone to take the Orange County director's position, so he split it up into two smaller complexes. Arave did not express interest in those smaller positions. We cannot find, considering the totality of the circumstances, that the jury was required to find the decision not to interview Arave for the Orange County director's position was an adverse employment decision. The jury could reasonably have concluded the decision did not materially affect the terms, conditions, or privileges of Arave's employment. Since Arave identifies no other basis for questioning the jury's finding of no adverse action, we will affirm the verdict on the discrimination claim.

### 2. *Finding of no vacation time*

Arave contends the jury's verdict on his unpaid wage claim (Lab. Code, § 201) is not supported by substantial evidence. We disagree.

Wendy Wall testified BoA keeps a database of accrued vacation time in the normal course of business. She also testified the database shows Arave had no accrued vacation time as of the date of his resignation. That evidence provided a sufficient basis for the jury to find Arave had no accrued vacation time when he resigned, and we cannot

68

overturn the jury verdict in the face of that evidence. (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968 ["'We must . . . view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court'"].)

Arave points to other evidence from which the jury could have inferred he did have accrued vacation time. The transition when BoA acquired Merrill Lynch is important to Arave's version of events. Merrill Lynch employees, like Arave, became BoA employees on January 1, 2010. BoA employees of Arave's seniority do not accrue vacation time, but Merrill Lynch employees accrued four weeks of vacation time each year during the period 2006 to 2009. Thus, the evidence supported the conclusion that Arave received 16 weeks of vacation time from 2006 to his resignation on March 29, 2011, and would have accrued any unused time by December 31, 2009. Arave testified he took one week of vacation to go to Lake Shasta with his family every year, and took one week-long vacation to Europe. From this evidence, Arave contends, the jury was required to conclude he had accrued 11 weeks of vacation time, which was limited to eight weeks under the Merrill Lynch cap on accrued vacation time. We disagree. Arave did not say the vacations he discussed were the *only* ones he took in the years 2006 to 2009. The jury could have concluded he omitted other vacation time he took or that he

69

did not carry his burden of showing he had unused vacation time at the time he resigned.[11]

### F. *Denial of Motion for New Trial*

Arave contends the trial court erred in denying his motion for a new trial. He bases his argument on the same assertions of error we have discussed and rejected in parts II.A., B., C., D., and E. For the reasons we have already discussed above, we conclude the trial court did not abuse its discretion by denying the motion for new trial. (*Bender. v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 981.)

### G. *Attorney Fees*

The parties cross-appeal the trial court's order concerning defendants' request for attorney fees. Defendants filed a motion seeking total attorney fees of $1,203,225.56. They apportioned the total equally among Arave's claims, and therefore asked for $200,537.60 for the defense of Arave's wage claim and $1,002,687.96 for the defense of Arave's FEHA claims. Defendants requested no fees for the defense of Arave's retaliation claim under Labor Code section 1102.5, which the trial court dismissed at summary judgment.

The court denied defendants' request for attorney fees related to the defense of his FEHA claims, holding they were not entitled to fees under Government Code section 12965, subdivision (b) (Section 12965(b)) under *Rosenman v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro* (2001) 91 Cal.App.4th 859, 864-865, which held it

---

[11] Arave also suggests an error occurred in recording his accrued time to the BoA database, but he has presented no evidence that such an error did occur.

70

improper to award attorney fees to prevailing defendants unless the FEHA case was "frivolous, unreasonable, or totally without foundation."  The trial court said, "I understand and considered defendants' argument in the reply that you believe plaintiff fabricated evidence to get past summary judgment.  But in looking at the *Rosenman* case, I can't say that this is that."  The court remarked it "cannot find that plaintiff never had a prima facie case of discrimination, harassment, and retaliation," though it later clarified it considered the fact defendant prevailed at summary judgment only "as a threshold.  But more, I considered the facts of the case."

The trial court requested further evidence on the appropriate amount of fees for the wage claim, finding it inappropriate to simply award one seventh of the fees incurred defending the entire litigation.  After defendants submitted billing records to support their request, the trial court awarded defendants $97,500 under Labor Code, section 218.5, for 300 hours work defending Arave's wage claim.

Arave appeals the award of $97,500, and defendants appeal the denial of attorney fees on the FEHA claims.

### 1. *Award of attorney fees on Arave's wage claim*

The parties agree the trial court awarded defendants attorney fees on Arave's wage claim under the wrong standard.  The Legislature amended Labor Code section 218.5 (Section 218.5) effective January 1, 2014, before the trial court awarded attorney fees on the wage claim.

The amended statute provides an employer may obtain attorney fees on a claim for nonpayment of wages only "if the court finds that the employee brought the court action in bad faith." (Lab. Code, § 218.5, subd. (a).) The legislative history indicates the Legislature intends employers to recover fees when they "defeat frivolous claims," which "would align the statute with the state and federal civil rights and employment statutes."[12] (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 462 (2013-2014 Reg. Sess.) July 2, 2013, p. 4) Thus, defendants would be entitled to attorney fees only if Arave's wage claim was frivolous. Because the trial court did not make such a finding, we will reverse and remand for the trial court to determine whether attorney fees are appropriate under the correct standard.

### 2. *Denial of attorney fees on Arave's FEHA claims*

Defendants appeal the trial court's order denying them attorney fees under Government Code section 12965 on Arave's five FEHA claims. They rightly acknowledge they are entitled to attorney fees only if they show the FEHA claims were objectively without foundation when Arave brought them or Arave continued to litigate the claims after it became clear they were objectively without basis. We review the trial

---

[12] We grant defendants' motion for judicial notice of the legislative history of the amendment to Section 218.5. (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 709, fn. 9.)

court's denial of attorney fees to defendants for abuse of discretion.[13] (*Cummings v. Benco Building Services* (1992) 11 Cal.App.4th 1383, 1387.)

Defendants' argument for reversing the trial court's conclusion turns on the evidence BoA employees tried to get Arave to apologize for his religion. According to defendants, Arave survived summary judgment by falsely accusing Holsinger and Anderson of issuing or enforcing this directive. It is beyond question Arave testified, both at his deposition and at trial that Holsinger told him he would have to apologize for the atmosphere he was accused of creating. At trial, Arave said Holsinger issued that directive at their January 25 meeting. But defendants claim other evidence disclosed in discovery disproved his testimony and shows Arave knew his claim was objectively baseless.

Defendants point to several answers in Arave's deposition to show he knew he was not asked to apologize. According to defendants, Arave testified:

- Holsinger did not mention religion on their January 18 call.
- Arave told Holsinger he was pleased with the direction Holsinger was taking after a conference call on January 19.
- Holsinger did not ask Arave to "apologize for religion" during their January 25 meeting.
- Arave had no memory of their March 8 phone call independent of the notes from the meeting and the notes say nothing about being asked to apologize.

---

[13] Defendants contend the trial court applied the wrong standard because it said it could not "find that plaintiff never had a prima facie case of discrimination, harassment, and retaliation." We doubt the court used the wrong standard based on this statement. The transcript of the proceedings show the court considered the proper law and applied the proper standard.

Defendants point out Arave admitted he had three conversations with Holsinger about the survey comments, and so he contends his deposition testimony proves Holsinger never demanded that he apologize for his religion.

However, defendants' representation of Arave's deposition testimony is incomplete. He said Holsinger asked him at their January 25 meeting "to go to the complex and say take responsibility for that, apologize for what you've done, change some of the behavior patterns that you have." At the same meeting, he said Holsinger told him he "needed to apologize for the things that I was doing around my religion that created these perceptions" and "that I'd created this environment around religion in my complex that was unhealthy." That evidence is consistent with his trial testimony, and is sufficient to convince us the trial court had a sound basis for and did not abuse its discretion in concluding Arave's FEHA claims were not frivolous or objectively baseless.

Moreover, that testimony did not stand on its own. Franks wrote Holsinger that Arave "may very well need to do a public mea culpa in front of his office in order for them to believe he has read the results and has taken them to heart. I have seen this before and it is very difficult to get buy in and to buy time without this type of response." Holsinger responded he was "already there on the mea culpa. Asked him to work with Kathy and present message to me first as devil's advocate." Though Franks denied understanding that "mea culpa" means to acknowledge personal error and Holsinger tried to neutralize the email exchange by explaining the role the term plays in the Merrill Lynch business-speak lexicon, the jury could have rejected their testimony as self-serving

74

and found the exchange to be circumstantial evidence supporting Arave's accusation that they had asked him to apologize.

In addition, Anderson confirmed Arave was upset about the issue on their March 23 call. She testified Arave got emotional discussing the issue and talked about feeling like he was being asked to apologize for his religion and kept returning to the point. Anderson said she told him that was not true. Anderson's testimony, too, provided the jury some basis for finding in Arave's favor. That they did not do so does not indicate his claim was frivolous.[14]

We conclude the trial court did not abuse its discretion in concluding an award to defendants of FEHA attorney fees was not justified.

### H. *Award of Ordinary Costs and Expert Witness Fees*

Defendants filed a memorandum of costs dated October 24, 2013 with the trial court seeking an award of $84,017.68 in costs. Defendants sought $29,097.50 in expert witness fees under Code of Civil Procedure section 998 (Section 998) for three expert witnesses. The remaining fee request for $54,920.18 covered ordinary litigation costs— court filing fees ($2,400), jury fees ($2,545.76), fact witness deposition costs ($43,018.54), service of process costs ($1,695), fact witness fees ($121.88), and statutory

---

[14] Defendants also contend Arave's FEHA claims were frivolous because (i) Arave concedes no evidence shows only one or two people wrote the survey favoritism comments, (ii) the evidence plainly establishes Anderson *did* give Arave talking points to address the survey results, and (iii) the Orange County complex director position was eliminated. We believe those facts detract from the weight of the evidence in favor of Arave's FEHA claims, but do not establish the claims were baseless.

court reporter fees ($5,139). Arave filed a motion to strike or tax defendant's memorandum of costs.

The trial court granted Arave's motion in part, but struck only $375 in costs overall and awarded defendants $83,642.68. That total comprised $54,545.18 in ordinary litigation costs under Code of Civil Procedure section 1032 (Section 1032) and $29,097.50 in expert witness fees under Section 998.

### 1. *Ordinary Costs on FEHA claims*

The parties agree the trial court applied the wrong standard in awarding $54,545.18 in ordinary legal costs as of right under Section 1032. In *Williams*, the Supreme Court held a prevailing defendant cannot recover ordinary costs on FEHA claims "unless the court finds the action was objectively without foundation when brought, or the plaintiff continued to litigate after it clearly became so." (*Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 115 (*Williams*).) As we have discussed in part II.G., the trial court held the FEHA claims were not objectively without foundation, a ruling we affirm. It follows defendants were not entitled to recover ordinary costs incurred in defending Arave's FEHA claims, so we will reverse the order granting those fees.

We note, however, the holding in *Williams* does not preclude defendants from obtaining ordinary costs on Arave's *wage* claim. We are unable on the record before us to differentiate those costs, and the decision to award attorney fees lies properly with the trial court, so we will remand the case to the trial court to resolve that issue.

76

## 2. *Expert witness fees on FEHA claims*

Arave also contends the trial court erred by awarding defendants $29,097.50 in postsettlement offer expert witness fees under Code of Civil Procedure section 998, subdivision (c) (Section 998(c)). Arave argues a defendant who prevails on a FEHA claim may recover expert witness fees under Section 12965(b) only when the plaintiff's case has been found to be frivolous. Because the trial court found to the contrary, Arave contends we must reverse the award of expert witness fees.[15] We review the trial court's resolution of this issue of statutory construction de novo. (*Holman v. Altana Pharma US, Inc.* (2010) 186 Cal.App.4th 262, 277 (*Holman*).)

### a. *Background*

On June 11, 2012, defendants made Arave an offer to compromise under Section 998. The offer proposed "to compromise the claims in this action, which would constitute a final disposition of the action" by paying Arave "$100,000 for his seventh cause of action for failure to pay wages" and any statutory penalties arising out of that cause of action. Arave was to execute and file a Request for Dismissal with Prejudice of the entire action in favor of Defendants." They also proposed the parties could seek "[p]ayment of statutory costs, including attorneys' fees, reasonably incurred to the date of this offer to the prevailing party as determined by the Court" and that otherwise the parties would bear their own fees and costs. They specified they made the offer "on the

---

[15] Arave also contends the trial court erred in awarding defendants expert witness fees under Section 998(c) because defendants' settlement offer was not reasonable. We need not reach that issue because we conclude Section 998(c) does not allow the award of expert witness fees incurred defending nonfrivolous FEHA claims.

77

condition that Plaintiff will agree to execute a release as to all current claims against Defendants."

Arave did not accept the offer and the case proceeded to summary judgment and trial, which commenced nearly 14 months later on August 7, 2013. Arave prevailed at summary judgment on all but the harassment claim as it related to Anderson and the whistleblower retaliation claim. However, as we have discussed, Arave did not prevail on any of his remaining claims at trial. Arave voluntarily dismissed the claim for wrongful termination in violation of public policy after the close of evidence, and the jury found in favor of defendants on the remaining four FEHA claims and the Labor Code wage claim.

Defendants requested fees and costs as the prevailing party and included a request for $29,097.50 in postoffer expert witness fees. The trial court considered Arave's objection that the FEHA statute governs whether the prevailing party can recover expert witness fees, but determined it was appropriate "to award . . . expert witness fees and costs pursuant to . . . [section] 998" notwithstanding FEHA, and found defendants' offer of compromise was not unreasonable. The trial court indicated it was following the holding of the First District in *Holman*, *supra*, 186 Cal.App.4th 262.

b. *Awarding expert witness fees under Section 12965(b)*

In FEHA cases, Section 12965(b) permits the trial court, in its discretion, to "award to the prevailing party reasonable attorney's fees and costs, including expert witness fees." Adopting the federal Title VII standard announced in *Christiansburg*

78

*Garment Co. v. EEOC* (1978) 434 U.S. 412, 416-417, 421-422, case law interpreting the FEHA statute has read the cost shifting provision as asymmetric—prevailing plaintiffs are presumed to receive their costs and fees, but prevailing defendants may recover only if they show the plaintiff's FEHA claims are frivolous. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 984 (*Chavez*).) "In enacting the FEHA, the Legislature sought to safeguard the rights of all persons to seek, obtain, and hold employment without discrimination on account of various characteristics, which now included race, religion, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, and sexual orientation." (*Id.* at p. 984 [citing Gov. Code, § 12920].) The Legislature imposed the limitation on cost shifting in favor of defendants so victims of discrimination would not be discouraged from bringing meritorious claims. (*Williams*, *supra*, 61 Cal.4th at pp. 112-113.)

So, in 2010, the California Supreme Court established that an award of *attorney fees* to a prevailing FEHA defendant is permissible "only when the plaintiff's action was frivolous, unreasonable, without foundation, or brought in bad faith." (*Chavez*, *supra*, 47 Cal.4th at p. 985.) And, five years later, the high court extended the frivolity standard to awards to prevailing defendants of *ordinary litigation costs* generally available in civil litigation under Code of Civil Procedure section 1032, subdivision (b) (Section 1032(b)). (*Williams*, *supra*, 61 Cal.4th at p. 115.) The *Williams* court explained "a prevailing *plaintiff* should ordinarily receive his or her costs and attorney fees unless special circumstances would render such an award unjust. [Citation.] A prevailing *defendant*,

79

however, should not be awarded fees and costs unless the court finds the action was objectively without foundation when brought, or the plaintiff continued to litigate after it clearly became so." (*Ibid*.)

Arave asks us to extend these principles and hold Section 12965(b) similarly requires a prevailing defendant to show a plaintiff's claims were frivolous to recover expert witness fees.

As a threshold matter, we agree with Arave that the standard applicable to attorney fees and ordinary costs also applies to expert witness fees for a prevailing FEHA defendant. The plain language of Section 12965(b) treats expert witness fees as a category of costs. "In actions brought under this section, the court, in its discretion, may award to the prevailing party reasonable attorney fees and costs, *including expert witness fees*." (Italics added.) Though the statute does not say explicitly that expert witness fees sought by prevailing FEHA defendants are subject to the frivolity standard, that is true of requests for attorney fees and ordinary costs as well. And as we have noted, our high court has interpreted the statute as requiring defendants to prove a FEHA claim frivolous to recover attorney fees and ordinary costs. (*Williams*, *supra*, 61 Cal.4th at pp. 112-113; *Chavez*, *supra*, 47 Cal.4th at p. 985.) As the *Williams* court noted, "our Legislature, like Congress before it, sought 'to encourage persons injured by discrimination to seek judicial relief'" and "[t]he Legislature could well have believed the potential for a cost award in the tens of thousands of dollars would tend to discourage even potentially meritorious suits by plaintiffs with limited financial resources." (*Williams*, at pp. 112-

80

113.) Expert witness fees, which can run much higher than ordinary costs, raise precisely the same concern, and we see no basis in the statute, our case law, or public policy for treating them differently.

Federal courts have reached the same conclusion under the federal anti-discrimination statute. "[E]xpert witness fees may not be awarded to a prevailing defendant in a Title VII case unless the plaintiff's claim is 'frivolous, unreasonable, or groundless, or . . . the plaintiff continued to litigate after it clearly became so.'" (*AFSCME v. County of Nassau* (2d Cir.1996) 96 F.3d 644, 646.) "[T]o avoid discouraging all but airtight claims, courts focus on whether a plaintiff's claim is colorable and of arguable merit when considering fee award requests from defendants. [Citation.] When a plaintiff presents some credible evidence to prove her claim, she has shown that her case has colorable merit; consequently, the prevailing defendant is not entitled to attorney's (or, in this case, expert's) fees." (*Jackson v. Entergy Operations, Inc.* (E.D.La., May 4, 1998, CIV. A. No. 96-4111, 1998 WL 231019, at *2).) "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354.) For all these reasons, we conclude FEHA authorizes a prevailing defendant to recover expert witness fees only upon showing the plaintiff's FEHA cause of action was objectively baseless. (Accord, *Baker v. Mulholland Security and Patrol, Inc.* (2012) 204 Cal.App.4th 776, 784.)

This conclusion does not end our analysis, however.  FEHA's Section 12965(b) may not authorize expert fee awards to prevailing defendants absent a showing of frivolity, but it does not follow it prohibits their award under another statutory provision. We must also look to Section 998(c) and decide whether it overrides the limitation on awarding expert witness fees to prevailing FEHA defendants.

c.  *Applying Section 998(c) to FEHA*

Section 998 exists to encourage settlement of disputes, where possible, before the parties and the public have incurred the sizeable expense of conducting a full-blown trial. It applies in cases, like this one, where one party has made and the other party has rejected a settlement offer before trial.  It provides "[t]he costs allowed under Sections 1031 and 1032 shall be withheld or augmented as provided in this section.  [¶] . . . [¶]  If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs[16] and shall pay the defendant's costs from the time of the offer.  In addition . . . the court . . . in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually

---

**16**  The Legislature amended Section 998(c) effective January 1, 2016 to limit awards to postoffer expert witness fees.  Before that, and at the time of judgment in this case, it lay within the trial court's discretion to award fees incurred before the offer as well.  (*Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, 533.)

82

incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration of the case by the defendant."[17] (§ 998(c).)

The question we face is whether this provision allows defendants to recover expert witness fees even though Arave's FEHA claims were not frivolous and FEHA's fee and cost provision itself bars the award of expert witness fees incurred in defending nonfrivolous claims. Our answer is no. There is a conflict between Section 998(c) and Section 12965(b) as applied in this case. Section 12965(b) *precludes* the trial court from exercising its discretion to award defendants expert witness fees because plaintiff's FEHA claims were not frivolous. However, Section 998(c) purports to *authorize* the trial court to exercise its discretion and award defendants at least a portion of their expert witness fees because they offered to settle for an amount greater than the verdict. We resolve the conflict in favor of the FEHA provision, which the Legislature enacted as part of a comprehensive statutory scheme designed to encourage victims of discrimination in employment or housing to seek relief. Because Section 12965(b) provides for the award of attorney fees, ordinary costs, and expert witness fees in FEHA actions in a way that conflicts with the generally applicable provisions for such awards, we conclude the later, more specific FEHA provisions control. (See *In re Marriage of Green* (1989) 213 Cal.App.3d 14, 24 [holding Section 998 does not apply to family law cases, because the

---

[17] The statute has a parallel provision for cases where plaintiffs make and defendants reject a settlement offer. (Code Civ. Proc., § 998, subd. (d).)

83

Legislature specifically provided how costs and fees are to be awarded in such proceedings].)

Our conclusion is consistent with the plain language of the statutes as interpreted by the Supreme Court. Section 998(c) allows a trial court to award a defendant expert witness fees incurred after plaintiff declines a reasonable pretrial settlement offer, but only as an *adjustment* to an award of costs under Section 1032(b).[18] "The costs allowed under Section . . . 1032 shall be withheld or augmented as provided in this section." (Code Civ. Proc., § 998, subd. (a).) As the Supreme Court explained in *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 1000, we must read Section 998(c) in conjunction with Section 1032(b), "including the requirement that section 998 costs and fees are available to the prevailing party '[e]xcept as otherwise *expressly* provided by statute.'" And in *Williams*, the Supreme Court held the cost shifting provision of Section 12965(b) is an express exception to the cost shifting provision of Section 1032(b), which led the high court to conclude a prevailing defendant may *not* obtain ordinary costs under Section 1032 if the plaintiff's FEHA claims were nonfrivolous. (*Williams*, *supra*, 61 Cal.4th at p. 115.) If Section 12965(b) overrides Section 1032(b), and Section 998(c) operates only as an adjustment to cost awards under Section 1032(b), it follows that Section 12965(b) overrides Section 998(c), rather than the other way around. We

---

[18] Section 998 awards also adjust costs allowed under Code of Civil Procedure section 1031, which is irrelevant here because it applies to "actions for the recovery of wages for labor performed, where the amount of the demand, exclusive of interest, does not exceed three hundred dollars."

84

conclude that if a defendant may not *obtain* an award of costs under Section 1032(b) if plaintiff's claim are nonfrivolous, the trial court may not *augment* an award of costs by awarding expert witness fees under Section 998(c).

At oral argument, respondents conceded—for nonfrivolous FEHA claims—that Williams bars the trial court from awarding prevailing defendants ordinary costs under Section 998(c)(1). According to Section 998(a), such an award would be an adjustment to a cost award under Section 1032, and Williams holds the trial court may not award such costs to a FEHA defendant unless the claim was frivolous. Respondents contend Section 998(c)(1) treats expert fees differently, not as adjustments to costs that are otherwise recoverable. The statutory plain language says otherwise. Subdivision (a) provides "[t]he costs allowed under Section[] . . . 1032 shall be withheld or augmented as provided in this section." (§ 998, subd. (a).) By its terms, then, all costs recoverable under Section 998 are reductions to or augmentations of costs awarded under Section 1032.

Nothing in Section 998(c)(1) warrants treating expert fee costs as a special case. The first clause concerns ordinary costs: "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer." The second clause concerns expert fee costs: "In addition, . . . the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses, who are not regular employees of any

85

party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." (§ 998 subd. (c).) These provisions are parallel, treating both ordinary costs and expert fee costs identically. If Williams bars imposing Section 998(c) ordinary costs, we conclude it bars imposing Section 998(c) expert witness fee costs as well.

The most natural reading of these statutes is that the express cost shifting provision in Section 12965(b) overrides Section 998(c). The Legislature incorporated specific cost shifting principles into FEHA. Those provisions govern the award of expert witness fees incurred either prosecuting or defending FEHA claims. This means prevailing defendants cannot obtain expert witness fees in FEHA cases where the claims against them are nonfrivolous, frustrating Section 998's policy of encouraging settlement in such cases. However, the Legislature could have incorporated a provision to encourage pretrial settlement if that policy could be harmonized with the policy of encouraging victims with colorable discrimination claims to vindicate their rights without fear of facing financial hardship if they do not prevail. The Legislature did not do so, and we do not believe it is appropriate to read such a provision into Section 12965(b). (Code Civ. Proc., § 1858; *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 442.)

Our holding applies only to FEHA cases in which expert witness fees are not available under Section 12965(b). In cases where a trial court has discretion to award expert witness fees under Section 12965(b), the court may consider the policies behind

86

both Section 12965(b) and Section 998(c) in exercising its discretion.  (See *Williams*,

*supra*, 61 Cal.4th at p. 108.)  Thus, in a case where the defendant prevails after trial

against a frivolous FEHA claim, the court may consider whether the plaintiff rejected a

reasonable settlement offer in deciding whether to award expert witness fees.  It may also

consider the plaintiff's ability to pay.  (See *Holman*, *supra*, 186 Cal.App.4th at p. 284.)

Similarly, in a case where plaintiff prevails after trial, the court may consider whether the

defendant rejected a reasonable settlement offer in deciding whether to award the plaintiff

expert witness fees.  (§ 998, subd. (d).)

We recognize we are parting ways with the conclusion of our colleagues in the

First District, Division Five and the Fourth District, Division One.[19]  (*Holman*, *supra*, 186

Cal.App.4th 262; *Sviridov v. City of San Diego* (2017) 14 Cal.App.5th 514 (*Sviridov*).)

We do not find those decisions persuasive.  The *Holman* court reached its contrary

conclusion based on the premise that Section 12965(b) is *not* an express exception to

awarding costs under Section 1032(b).  The Supreme Court rejected that premise in

*Williams*, and we are required to conform to its conclusion that Section 12965(b) *is* an

express exception to Section 1032(b).  We conclude it follows that Section 12965(b)

precludes the award of expert witness fees the trial court made in this case.

---

[19]  Second District, Division Seven also approved an award of expert witness fees
in a FEHA case under Section 998(c) in *Seever v. Copley Press, Inc.* (2006) 141
Cal.App.4th 1550 (*Seever*).  However, the plaintiff in that case did not raise the objection
that such fees are available only if the FEHA claims were frivolous.

87

The principal reason the *Sviridov* court reached its contrary conclusion was plaintiff had forfeited the issue of whether *Williams* precludes a prevailing defendant from recovering costs on a nonfrivolous FEHA claim under Section 998. (*Sviridov*, *supra*, 14 Cal.App.5th at p. 521.) Plaintiff asserted his conclusion "with no analysis or citation to legal authority" and the court "deem[ed] the failure to support [his] statement with reasoned argument a forfeiture." (*Ibid.*) For the reasons we have discussed above, we believe a full consideration of the statutes and case law compels the conclusion defendants were not entitled to an award of expert witness fees in this case.

The *Sviridov* court also argued "a blanket application of *Williams* to preclude Section 998 costs unless the FEHA claim was objectively groundless would erode the public policy of encouraging settlement in such cases." (*Sviridov*, *supra*, 14 Cal.App.5th at p. 521) However, we believe our holding is correct because it properly takes into account the public policy of encouraging FEHA plaintiffs to bring meritorious claims. *Sviridov* does not mention this countervailing public policy other than to note plaintiff did "not establish[] the court did not properly consider the policies of both provisions in making the award." (*Id*. at p. 521.) As we have discussed above, we believe allowing Section 998(c) expert fee awards to defendants who are not entitled to expert witness fees under Section 12965(b) impermissibly undermines the effectiveness of FEHA.

The *Holman* and *Seever* courts tried to avoid that result by building FEHA protections into Section 998—requiring the trial courts to consider the plaintiff's means when they make discretionary expert witness fee awards. The *Seever* court held in FEHA

88

cases "consistent with the rationale of *Christiansburg* and like California decisions, it is entirely appropriate and indeed necessary for trial courts to 'scale' [expert witness fee] awards downward to a figure that will not unduly pressure modest- or low-income plaintiffs into accepting unreasonable offers." (*Seever*, *supra*, 141 Cal.App.4th at p. 1562.) The *Holman* court followed this approach. "[I]n assessing whether an expert fee award is reasonable in amount, at least in the FEHA context where other recognized public policy considerations apply, we agree that the court must not only look to whether the expense was reasonably incurred, but must also consider the economic resources of the offeree." (*Holman*, *supra*, 186 Cal.App.4th at p. 284.)

We agree the trial court may consider the means of the plaintiff as one factor in determining whether to award expert witness fees. However, the source of that authority lies in Section 12965(b)'s grant to the trial court to award expert witness fees as a category of costs. Our sister courts have gotten things backwards by building FEHA protections into Section 998. As the *Holman* court recognized, "[t]he Legislature has not included a means test as an element of determining awards generally under . . . section 998, and imposing such a requirement would alter the settlement incentives provided by [that section]." (*Holman*, *supra*, 186 Cal.App.4th at p. 284, fn. 30.) The First District court suggested the means test may best be applied to FEHA cases alone (*Holman*, at p. 284, fn. 30), but there is nothing in Section 998 itself to suggest it is appropriate to treat FEHA litigation as a special case. (*Maintain Our Desert Environment v. Town of Apple Valley*, *supra*, 124 Cal.App.4th at p. 442.)

89

Nor do we believe building a means test into Section 998 effectively protects prospective FEHA plaintiffs with meritorious claims. The test is backwards looking. It requires the trial court to exercise its discretion by determining, after litigation is complete and the plaintiff has lost or obtained a smaller than desired jury award, the extent to which the plaintiff can shoulder the burden of paying the defendant's expert witness fees. Prospective plaintiffs with meritorious claims trying to decide whether to attempt to vindicate their rights would not be able to predict their exposure. Any attorney advising a prospective plaintiff would have to acknowledge they may lose even a very strong suit and end up being compelled to pay defendant tens of thousands of dollars in expert witness fees. Indeed, if we accepted defendants' position, our decision would be an object lesson for all future FEHA plaintiffs of the risk of bringing colorable discrimination claims.

Accordingly, we will reverse the order awarding $29,097.50 in expert witness fees to defendants. We note, however, that our holding does not preclude defendants from obtaining expert witness fees on Arave's wage claim. We are unable on the record before us to make that apportionment, so we will remand the case to the trial court to do so as well as to determine whether awarding such fees is appropriate.

## I. *Summary Judgment in Favor of Anderson*

Finally, Arave contends the trial court erred by granting summary judgment in favor of Katherine Anderson on his harassment claim.

We review an award of summary judgment under the same standard applied by the trial court—de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) We take the facts from the record as it was before the trial court and construe the evidence liberally to support the party opposing summary judgment. (*Haberman v. Cengage Learning, Inc.* (2009) 180 Cal.App.4th 365, 377.)

To be actionable as harassment, Anderson's conduct would have to be so severe or pervasive that it altered the conditions of Arave's employment and created an abusive work environment. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608; *Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 877 [conduct must be so severe that it "would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee"].) Harassment "'cannot be occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature.'" (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 131.)

Further limiting harassment claims, our Supreme Court has explained "'the Legislature intended that commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will

91

not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment. These are actions of a type necessary to carry out the duties of business and personnel management. These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment. Harassment, by contrast, consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management.'" (*Reno v. Baird* (1998) 18 Cal.4th 640, 646-647.) Under this guidance, Arave's contention that Anderson committed harassment by failing to provide him adequate talking points, change his reporting structure, investigate his complaint about the survey comments, and bring his complaints to the attention of the Advice and Counsel group would not support a harassment claim.

As it happens, there is no evidence to support these accusations against Anderson. It is uncontested she did provide Arave talking points for use in addressing the survey results with his employees. Though she included only one bullet point on the comments about religious favoritism, Anderson said she was trying to get the process started. Arave did not take up her offer of help, so the fault for failing to develop detailed talking points on the issue lies with him. As for her "failure" to bring Arave's complaint about the comments to the attention of Advice and Counsel, it is uncontested Anderson knew the group was aware of the comments. Finally, there is no evidence Anderson had any authority to investigate the comments or change Arave's reporting structure after he delivered a demand letter to Merrill Lynch. Indeed, she knew people with greater

92

authority had the relevant information, including Holsinger, Wall, Franks, and Mack. Arave has no basis for blaming her for not taking action on those points.

That leaves only the allegations that Anderson demanded Arave apologize and then "badgered" him to hold a meeting addressing the favoritism comments. There are two problems with this basis for Arave's harassment claim. First, he did not testify that she asked him to apologize, but instead avoided the issue when Arave raised it. Arave said he reported Holsinger had told him to apologize, and Anderson expressed skepticism that he had done so. Second, both testified they never met in person and they spoke by telephone and emailed roughly four to nine times over the course of approximately two months. On their last call, Arave said Anderson said addressing the religious favoritism comments was important and explained Holsinger did not want him to apologize for his religion, but to "apologize for a perception." Moreover, Arave admitted Anderson did not tell him to stop recruiting from or hiring BYU graduates or members of his church, or treat members who worked for him differently. The handful of conversations Arave does report do not rise to the level of badgering, as Arave contends, and cannot constitute harassment as a matter of law because they are not so severe or pervasive that they altered the conditions of Arave's work and created an abusive environment. Accordingly, we will affirm the trial court's order granting Anderson's motion for summary judgment on the harassment claim.

93

# III

## DISPOSITION

We affirm in part and reverse in part with directions as set out below.

We reverse the trial court order awarding $54,545.18 in costs as contrary to FEHA's cost shifting provision as the Supreme Court held in Williams, supra, 61 Cal.4th at p. 115. (Part II.H.1., ante, p. 76.) We reverse the trial court order awarding $29,097.50 in expert witness fees as contrary to FEHA's cost shifting provision. (Part II.H.2., ante, pp. 77-90.) We remand for the trial court to determine whether it is appropriate to award any costs or expert witness fees on Arave's wage claim.

We also reverse the order awarding $97,500 in attorney fees on Arave's wage claim as contrary to the amended Labor Code section 218.5, subdivision (a). (Part II.G.1., ante, pp. 71-72.) We remand for the trial court to determine whether the wage claim was frivolous, warranting an award of attorney fees in any amount.

We affirm the judgment in all other respects.

The parties shall bear their own costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION

SLOUGH _____
                                            J.

We concur:


RAMIREZ _____
                    P. J.


McKINSTER _____
                    J.

94